**EGAN, Inc., Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15440.**

United States Court of Appeals
Eighth Circuit.

July 16, 1956.

Joseph A. Maun, St. Paul, Minn. (William R. Busch, St. Paul, Minn., Douglas Thornsjo, Minneapolis, Minn., and Bundlie, Kelley & Maun, St. Paul, Minn., on the brief), for petitioner.

C. Guy Tadlock, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Acting Asst. Atty. Gen., and Lee A. Jackson and L. W. Post, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before GARDNER, Chief Judge, and WOODROUGH and VAN OOSTERHOUT, Circuit Judges.

WOODROUGH, Circuit Judge.

Egan, Inc., a taxpayer corporation, petitioner herein, seeks reversal of the decision of the Tax Court entered May 9, 1955, (unreported) upholding determination of the Commissioner that the corporation was availed of in 1948 for the purpose of preventing the imposition of surtax upon its sole stockholder, Henry G. Egan, through the medium of permitting earnings or profits to accumulate instead of being distributed, and sustaining surtax imposed under Section 102 of the Internal Revenue Code of 1939, 26 U.S.C.A. Sec. 102(a) and (c).[1]

---

1. "§ 102. Surtax on corporations improperly accumulating surplus.

"(a) Imposition of tax. There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

"27½ per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus

"38½ per centum of the undistributed section 102 net income in excess of $100,-000.

\*    \*    \*    \*    \*

"(c) Evidence determinative of purpose. The fact that the earnings or profits of a

The Commissioner's position was that the business carried on by the Petitioner had always consisted in selling Chevrolet cars and trucks under a sale franchise agreement with Chevrolet Motor Division of General Motors Corporation which was terminated on October 31, 1948, and petitioner received no more cars or trucks to sell and therefore had no business need for the large surplus of more than $750,000 it had accumulated from profits, but retained it for the purpose of preventing the imposition of surtax on its only stockholder, Mr. Egan.

The petitioner's claims were presented in its petition to the Tax Court for redetermination of deficiency as follows:

"During the year ended December 31, 1948, until on or about October 31, 1948, and for many years prior thereto petitioner had held a franchise to purchase and sell new Chevrolet automobiles and trucks. On or about October 31, 1948, petitioner lost said franchise. The loss of said franchise substantially destroyed the earning power of petitioner until such time as it could secure another like franchise or develop a new line of business. Petitioner was unable to secure another like franchise to purchase and sell new automobiles and trucks during the part of the year 1948 remaining after its said loss. As of December 31, 1948 it was imperative that petitioner conserve its assets for such new operations as it might undertake. It would have been unwise, improvident and unbusinesslike for petitioner to have declared a dividend in the year 1948 for the reason that it had completely lost its principal sources of income. In the normal course of events all of said funds would have been needed and required to commence new operations. The avoidance of the surtax to the stockholders was not a factor or a considera-

tion in the failure to pay dividends. Petitioner did not distribute any of its earnings for the year ended December 31, 1948, for the reason that it was essential that the same be retained by it."

In its Findings of Fact and Opinion the Tax Court presents a complete summary of the matters stipulated by the parties and of the evidence contained in some 200 pages of narrative and the grounds upon which its decision was rendered in favor of the Commissioner ordering deficiencies. The Tax Court found that "petitioner was availed of during 1948 for the purpose of preventing the imposition of the surtax upon its sole shareholder, Egan, through the medium of permitting earnings to accumulate instead of being divided or distributed." It stated in its Opinion that "it is plainly apparent that on the date of termination of its Chevrolet sales franchise on October 31, 1948, and because thereof, it had been dealt its death blow from which it was at no time considered it would recover. It therefore at that time had no reasonable business needs, either present or prospective, for its rather substantial surplus."

The Tax Court also said that, although Mr. Egan made attempts to regain a Chevrolet franchise, he did so without any real expectation of success. Before the close of 1948 he agreed with representatives of Chevrolet Motor Division to discuss the sale of the taxpayer's agency, realty and equipment to a successor to the franchise and effectuated such sale early in March 1949. He caused the company's charter to be amended on December 30, 1948, deleting "Chevrolet" from its name as it was obligated to do when it ceased to receive or sell Chevrolet cars on termination of the franchise, and authorizing it to transact real estate business instead. The court further stated that "during the closing months of 1948 Egan was but

corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless

the corporation by the clear preponderance of the evidence shall prove to the contrary."

exploring the possibilities of petitioner's continuance in some sort of business but had no real present intention that it should do so." It declared further that taxpayer failed to show any concrete basis for a finding that at December 31, 1948, it had business prospects other than winding up the car selling business it had been conducting. Mr. Egan came to his death in 1953 and in that year the taxpayer was liquidated and its assets were turned over to the executor of Mr. Egan's estate. It had never applied its accumulated surplus to any business needs.

On this review the petitioner does not question that the effect of retaining its large surplus accumulated in 1948 and prior years without distributing it was to save Mr. Egan from large surtax nor that the surplus was never used by it for any business needs. But it contends that findings should have been made in accord with the allegations of its petition for redetermination of deficiency above set forth and the surtax should have been set aside.

■ It is well settled that the issue raised was a question of fact to be determined by the Tax Court. Helvering v. National Grocery Company, 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; Bride v. Commissioner, 8 Cir., 224 F.2d 39, certiorari denied, 350 U.S. 883, 76 S.Ct. 136, and whether there was substantial evidence to support the ultimate findings can best be shown by setting forth a summary of the Findings of Fact of the Tax Court as follows:

Taxpayer is a Minnesota corporation and during the years here involved maintained its principal office at 222 North Concord Street, South St. Paul, Minnesota. It kept its books and filed its income tax returns on the basis of a calendar year and upon the accrual method of accounting.

Egan, Inc. is the present name of taxpayer. As incorporated, its name was Egan Chevrolet, Inc., the change having been effected by amendment to its charter on December 31, 1948. Taxpayer was incorporated December 14, 1932, with an authorized capital stock of $50,000 represented by 500 shares of par value stock at $100 per share. Only 100 shares of such stock were issued and were held as follows:

| | | Number of Shares Held on | |
| | | December 14, 1932 | December 31, 1948 |
|---|---|---|---|
| Henry G. Egan | President and General Manager | 98 | 100 |
| Alice M. Egan (Wife of Henry G. Egan) | Secretary-Treasurer | 1 | 0 |
| Alois J. Pieper | Vice-President (1932) Secretary (1948) | 1 | 0 |
| | Total | 100 | 100 |

Henry G. Egan, hereinafter referred to as Egan, died on January 15, 1953. Before his death, and by the close of 1948, he had acquired all of the outstanding stock of taxpayer. In 1927 he personally obtained an exclusive franchise from the Chevrolet Division of General Motors Corporation to sell Chevrolet automobiles and trucks in the city of South St. Paul, Minnesota. The term of the franchise was one year from November 1, 1927, to October 31 of the ensuing year, at which date termination occurred without the necessity of any act of termination on the part of either contracting party. However, the franchise was renewed each year until October 31, 1948, when it was finally terminated by the refusal of General Motors to renew the same.

On January 3, 1933, Egan conveyed his interest in the franchise agreement to taxpayer in exchange for 100 shares of fully paid capital stock of that corporation. In the same transaction Egan also conveyed to taxpayer his Chevrolet agency in South St. Paul. At that date the board of directors of the corporation fixed the fair market value of the franchise and the agency property at $26,680. Taxpayer subsequently conducted the Chevrolet sales agency under annual renewals of the franchise without interruption until October 31, 1948.

Among other requirements, the franchise imposed upon taxpayer the duty to maintain a new car sales agency, including a service station, parts and accessories and used car facilities, all of which were required to be conducted and maintained in a manner satisfactory to General Motors. Taxpayer might not change its business location without General Motors' consent. At the termination of the franchise, taxpayer was bound by its terms to discontinue the use of the word "Chevrolet" in its name.

Prior to 1941 taxpayer purchased new cars from the manufacturer for retail sale from its cash. It always had outstanding liability on note indebtedness, the highest being $305,895.78 in 1942. At the close of 1948 the amount for which it was liable on sales contracts was $81,800.

A substantial portion of sales were upon the installment basis. Such sales were evidenced by contracts which were in nearly all instances subsequent to 1946 assigned to either General Motors Acceptance Corporation, hereinafter referred to as G.M.A.C., or the Stockyards National Bank of South St. Paul. Upon such assignments of sales contracts taxpayer received from the assignee the full amount of the sales price for each automobile so sold less any down payment made. Full payment upon all assigned contracts was personally guaranteed by Egan and endorsed with recourse by taxpayer. Neither taxpayer nor Egan ever sustained a loss from such transactions. The year-end total amounts of sales contracts assigned by taxpayer for the indicated years were as follows:

| Year | Amount |
| --- | --- |
| 1946 | $ 66,336.11 |
| 1947 | 137,235.35 |
| 1948 | 162,628.90 |

The approximate average of monthly outstanding balances due on such sales contracts assigned to G.M.A.C. from December 1947 to December 1948, inclusive, was $100,162, and the approximate monthly balances due on contracts assigned to the Stockyards National Bank for the period August 1947 through December 1948 was $2,861.50. On the G.M.A.C. books an account was kept wherein a percentage of interest paid upon such contracts by the purchasers was credited and eventually paid to taxpayer, amounting in 1948 to $2,417.47 and in 1950 to $4,469.14.

Normally the business of selling new cars is highly competitive, but the years 1946, 1947, and 1948 were abnormal in this respect in that being the years immediately following World War II they were characterized by what is known as a "seller's market." The public demand for new cars during that period far exceeded the manufacturers' ability to produce, with the consequence that automobiles in the sense of inventory were not available to taxpayer. It sold all it could obtain. In 1946 taxpayer was requested by General Motors to build a larger garage and generally expand its business facilities in order to retain its Chevrolet franchise. To that end, taxpayer on December 1, 1946, set aside and earmarked the sum of $85,000. However, this fund was never used for that purpose. It was on December 9, 1949, transferred to taxpayer's "investment account" with the Northwestern National Bank of Minneapolis. Following the request of General Motors, taxpayer on November 19, 1947, began the construction of a one-story and basement garage building in South St. Paul. The new building was designed primarily for

truck sales and services. On September 8, 1948, further construction was halted, and as a result the building was never used actively in taxpayer's business. By the latter date taxpayer had expended the sum of $114,312.66 upon the construction of the building. Jaeson H. Kline, who was taxpayer's successor in ownership, completed the building for use in the operation of a Chevrolet sales agency at an additional cost of $105,840.-42.

Taxpayer's gross sales, accrued federal income tax, return income after federal income tax, and surplus for the years 1945 through 1948 were as follows:

| Year | Gross Sales | Accrued Federal Income Tax | Return Income after Federal Tax | Surplus per books adjusted to reflect accrual of Federal Income taxes per Federal Income tax returns |
|---|---|---|---|---|
| 1945 | $ 357,815.03 | $ 7,311.57 | $ 18,585.13 | $169,477.38 |
| 1946 | 899,521.74 | 75,137.40 | 122,592.61 | 303,774.35 |
| 1947 | 1,508,242.77 | 152,310.87 | 249,227.73 | 560,371.44 |
| 1948 | 1,613,395.48 | 136,393.37 | 222,915.35 | 626,876.19 |

With the exception of the $150,000 stock dividend paid in 1948, the only cash dividend paid by taxpayer from the time of its inception until its liquidation in 1953 was a cash dividend of $10,000 paid in 1936 to Henry G. Egan.

The balance sheets of taxpayer attached to its federal income tax returns for the years 1945 to 1948, inclusive, are as follows:

| Assets | 1945 | 1946 | 1947 | 1948 |
|---|---|---|---|---|
| Cash and Contracts in Transit | $ 97,641.55 | $179,439.25 | $448,783.91 | $ 474,567.13 |
| Accounts Receivable | 5,209.44 | 15,800.37 | 10,104.50 | 14,634.79 |
| Inventories | 66,068.27 | 105,685.79 | 128,400.05 | 96,862.41 |
| Prepaid Expense | 1,704.14 | 2,089.54 | 3,978.95 | 3,118.65 |
| Fixed Assets | 84,027.03 | 86,036.38 | 92,417.60 | 219,090.50 |
| Repossession Reserve | 577.93 | 1,291.07 | 3,510.05 | 4,424.55 |
| Advance to Employees and others | 300.21 | 24.13 | 19.14 | |
| Land | 20,000.00 | 20,000.00 | 51,240.00 | 55,504.05 |
| Discounts Receivable | 700.00 | 5,617.50 | 8,715.00 | 7,735.00 |
| Due from Affiliated Company Securities | 54,549.84 | 20,538.00 | 38,000.00 | |
| Accounts Payable, Debtor Balance | 3,360.58 | 470.94 | 450.00 | 106.25 |
| Officers' Accounts | | 12,460.46 | 12,839.87 | |
| Loans—Non-auto | | | | 125,000.00 |
| Totals | $334,138.99 | $449,453.43 | $798,459.07 | $1,001,093.00 |

## Liabilities

| | | | | |
|---|---|---|---|---|
| Accounts Payable | $ 8,554.09 | $ 16,040.32 | $ 18,806.63 | $ 5,545.56 |
| Accounts Receivable— | | | | |
|   Credit Balances | 17,903.32 | 9,328.83 | 15,564.96 | 11,984.89 |
| Due Officers | —0— | —0— | —0— | —0— |
| Notes Payable—Officers | 86,750.91 | —0— | —0— | —0— |
| Service Contract Dep. | 2,342.00 | 302.25 | 947.50 | 657.50 |
| Notes Payable | | | | |
| Accrued Interest | | | | |
| Accrued Expense | | | | |
| Accrued Payroll | 177.35 | 596.92 | 1,126.58 | 11,122.27 |
| Accrued Commissions | 67.00 | 113.66 | 212.32 | 113.82 |
| Accrued Insurance | 704.18 | 1,067.54 | 1,271.67 | 1,548.82 |
| Accrued Taxes | 4,553.17 | 5,089.37 | 6,350.99 | 10,780.87 |
| Reserve for Bad Debts | 254.53 | 186.03 | 502.87 | 126.14 |
| Reserve for Depreciation | 20,433.55 | 22,971.22 | 24,360.81 | 32,158.36 |
| Reserve for Used Cars | | | | |
| Withholding Tax Payable | 4,939.36 | 4,845.54 | 6,632.43 | 3,785.54 |
| Due Others | 670.58 | —0— | —0— | —0— |
| Income Tax Accrued | —0— | —0— | —0— | 151,729.21* |
| Capital Stock | 10,000.00 | 10,000.00 | 10,000.00 | 160,000.00 |
| Surplus | 176,788.95 | 378,911.75 | 712,682.31 | 611,540.35** |
| | $334,138.99 | $449,453.43 | $798,459.07 | $1,001,093.33 |

Taxpayer's gross sales, accrued federal income tax, return income after federal income tax, and surplus for the years 1949 to the date of its liquidation on March 18, 1953, were as follows:

| Year | Gross Sales | Income Tax Accrued Federal | Income per Return after Federal Income Tax | Surplus per books adjusted to reflect accrual of Federal Income taxes per Federal Income tax returns |
|---|---|---|---|---|
| 1949 | $146,193.78 | $3,804.41 | $13,171.31 | $626,277.69 |
| 1950 | 19,524.69 | —0— | (2,346.71) | 625,179.53 |
| 1951 | 27,832.98 | —0— | 6,344.96 | 629,902.05 |
| 1952 | 35,659.91 | 974.17 | 305.53 | 626,829.07 |
| 3–18–53 | 4,695.27 | 132.72 | 2,829.02 | 630,331.09 |

* Balance sheets do not reflect accrued Federal income and excess profits taxes, except for the year 1948.

**Surplus for 1948 is reduced by and reflects issuance of stock dividend of $150,000 to Henry G. Egan.

The balance sheets for taxpayer for the years 1949, 1950, 1951, 1952, and for the period ending March 18, 1953, per books, and adjusted to reflect federal income taxes, are as follows:

### Egan Inc.
### So. St. Paul, Minn.

| Assets | 1949 | 1950 | 1951 | 1952 | As at 3–18–53 (dissolution) |
|---|---|---|---|---|---|
| Cash | $339,587.15 | $ 9,706.98 | $ 384.05 | $ 6,073.54 | $ —0— |
| Notes Receivable | 23,804.28 | 19,500.00 | 18,020.00 | 16,508.21 | 16,114.28 |
| Inventories | 1,855.00 | —0— | —0— | —0— | —0— |
| Furniture and Fixtures | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| 1948 Chevrolet Pickup | —0— | 695.00 | 695.00 | —0— | —0— |
| Finance Company Reserve | 4,423.35 | —0— | —0— | —0— | —0— |
| Due from Officers | 18,691.65 | 16,278.48 | 8,301.38 | 21,103.25 | 21,103.25 |
| Securities | 85,000.00 | —0— | —0— | —0— | —0— |
| Loan—Riverview | 165,000.00 | 130,114.26 | 130,114.26 | 109,925.21 | 109,925.21 |
| Kline Mortgage | 157,699.99 | —0— | —0— | —0— | —0— |
| N. W. Nat'l Bank, Investment Account | —0— | 614,893.33 | 611,095.85 | 610,307.13 | 615,459.77 |
| Bonds | —0— | —0— | 26,618.28 | 34,118.28 | 34,118.28 |
| Total | 796,561.42 | 791,634.05 | 795,728.82 | 798,536.22 | 797,220.79 |
| **Liabilities** | | | | | |
| Accounts Payable | 108.55 | 108.55 | 108.55 | 583.55 | 1,052.72 |
| Accounts Receivable Cr. Balance | —0— | 3,172.40 | 2,544.65 | 2,455.19 | 2,455.19 |
| Withheld Taxes | —0— | —0— | —0— | 4,266.67 | —0— |
| Accrued Taxes | 3,173.57 | 3,173.57 | 3,173.57 | 3,377.57 | 3,188.57 |
| Reserve for Depreciation | —0— | —0— | —0— | 50.00 | 60.50 |
| Federal Income Taxes Payable | 3,804.41 | —0— | —0— | 974.17 | 132.72 |
| Capital Stock | 160,000.00 | 160,000.00 | 160,000.00 | 160,000.00 | 160,000.00 |
| Surplus | 626,277.69 | 625,179.53 | 629,902.05 | 626,829.07 | 630,331.09 |
| | $796,561.42 | $791,634.05 | $795,728.82 | $798,536.22 | $797,220.79 |

The advisability of declaring a dividend was discussed by taxpayer's board of directors on December 31, 1947. Because taxpayer had committed itself to an $85,000 building program with an assumed additional cost of $40,000 and the proposed necessary expenditure of $25,000 for furniture, fixtures and equipment, plus taxpayer's contingent liability to G.M.A.C. on the unpaid balances of assigned sales contracts which were endorsed with recourse, it was determined not to declare a dividend. At that time the unpaid balance due on such sales contracts was $81,800.

The number of cars and trucks sold over a period of years together with average cost and gross profit was shown. In 1948 the number was 1002.

The financing of its own conditional sales contracts would have been a profitable and desirable business as an adjunct for or phase of the taxpayer's automobile sales agency. Its immediate succes-

sor to the agency and the Chevrolet franchise, Jaeson H. Kline, in examining taxpayer's records preparatory to purchasing its physical assets, and with the object in mind of operating his own car sales finance business in connection therewith, believed the amount of required capital for so doing would be $190,000 in 1948. Kline was a man of long experience in the business of operating automobile sales agencies. Egan, his son as an employee of taxpayer, and taxpayer's treasurer had at various times during the years here involved discussed informally the carrying on by taxpayer of such a finance business. Some investigatory steps were taken from time to time by one or the other of them to that end. At no time, however, did taxpayer actually embark upon such a project or take any formal action looking thereto.

Beginning in late 1947 Chevrolet Motor Division of General Motors Corporation instituted an intensive investigation of complaints of customers of taxpayer with respect to selling practices which, if true, were in violation of the franchise agreement. Egan was aware of the investigation which extended over a period of seven months. From May 27, 1948, until July 10, 1948, the taxpayer did not receive any shipment of new cars. Subsequent to July 10, 1948, and until October 31, 1948, taxpayer continued to receive shipments of new cars. On July 23, 1948, taxpayer was notified in writing by General Motors that its franchise agreement would not be renewed at the expiration of its term on October 31, 1948, and that its authorized dealership would thereupon be cancelled. Egan made repeated efforts to have the franchise renewed but after a full hearing was finally notified orally by the president of General Motors that the contract would not be renewed. Such proved to be the case, for taxpayer at no time subsequent to October 31, 1948, ever possessed or operated under an automobile sales franchise agreement with a division of General Motors or with any car manufacturer. At a conference with representatives of Chevrolet Motor Division held on October 27, 1948, Egan agreed to discuss the disposition of taxpayer's assets with applicants for the franchise in South St. Paul.

Egan, a man of determination and "drive" in prior years, was still hopeful of somehow regaining the Chevrolet franchise for taxpayer, of obtaining the franchise of another automobile manufacturer, or of taxpayer's entry into the real estate business. With these aspirations in mind, he effected an amendment to taxpayer's charter on December 31, 1948, as hereinabove mentioned. The amended charter authorized the conduct by taxpayer of a real estate business and deleted the word "Chevrolet" from its corporate name. The amendment further provided for an authorized capital stock increase from $50,000 par value to $200,000. As of the same date, taxpayer paid a stock dividend of $150,000 (1,500 shares) par value, all of which was issued to Henry G. Egan, increasing the corporation's outstanding stock to 1,600 shares with a par value of $160,000, all of which was owned by Egan. Taxpayer at that time owned the agency building then in use and the partially constructed building before referred to. It was in an advantageous position to purchase two apartment buildings recently constructed by Riverview, Inc., a corporation in which Egan held a controlling stock interest and which is more particularly referred to hereinafter.

At a meeting of the board of directors of taxpayer held December 30, 1948, the primary issue discussed was whether or not dividends should be declared since taxpayer's surplus would be, in view of the board, approximately $750,000 at the close of that year. In resolving not to declare a dividend, the following factors were stated on the minutes: That it did not appear the Chevrolet franchise would be renewed, that a new business enterprise would have to be undertaken, that the most feasible field for a new enterprise would be real estate, and that the estimated capital for entering that field

would involve an approximate figure of from $300,000 to $500,000.

Egan made appeals to the general sales manager of Chevrolet for renewal of the franchise. All the requests were refused. Egan talked with the representative of Hudson Motor Company relative to the possibility of obtaining its sales franchise. Nothing of substance resulted therefrom. On March 9, 1949, taxpayer's two buildings, its agency and equipment were sold to Jaeson H. Kline.

The net working capital of taxpayer for the years 1945 through 1948 was as follows:

|  | Current Assets | Current Liabilities | Net Working Capital |
|---|---|---|---|
| 1945 | $227,575.36 | $126,661.96 | $100,913.40 |
| 1946 | 339,850.41 | 37,384.43 | 302,465.98 |
| 1947 | 646,809.60 | 50,913.08 | 595,896.52 |
| 1948 | 718,829.44 | 197,268.48 | 521,560.96 |

On March 18, 1953, subsequent to the death of Egan, petitioner was completely liquidated and all of its assets distributed to the executor of Egan's estate.

On June 10, 1948, petitioner loaned the sum of $100,000 to Riverview, Inc., and on November 28, 1948, an additional $25,000 for beginning the construction of two apartment buildings. The loans were made for one year and thereafter were callable on demand. The former loan was made during the period of temporary lapse in the shipment of new cars to petitioner.

Riverview Chevrolet, Inc. was organized under the laws of Minnesota on September 19, 1953, with an authorized capital stock of $50,000 consisting of 500 shares of common stock having par value of $100 per share.

One hundred shares of stock were issued at the inception of Riverview Chevrolet, Inc. At that time Egan acquired 98 shares, his wife (Alice M. Egan) acquired one share, and his accountant (Alois J. Pieper) acquired one share. On the death of Alice M. Egan in August 1936, her one share was reissued to Mrs. Frances Egan (Egan's mother) as of September 1, 1936. On December 30, 1936, a 150 additional shares of stock were issued to Egan for $15,000. On December 22, 1941, and upon the death of his mother (Mrs. Frances Egan), he acquired the share of stock owned by her.

On December 22, 1941, Riverview Chevrolet, Inc. was rendered inactive and its assets were sold to Egan Chevrolet, Inc. All stock, except one share owned by Alois J. Pieper, was purchased by the corporation (Riverview Chevrolet, Inc.) and retired. In order that the corporation would have a stated capital of $1,000, Egan loaned the corporation $1,000 on a non-interest bearing note.

On April 15, 1948, Egan decided to reactivate Riverview Chevrolet, Inc. On April 16, 1948, its articles of incorporation were amended so as to change its name to Riverview, Inc. and to enlarge and change its powers. Mr. Egan subscribed to 175 shares of stock of Riverview, Inc. paying $16,500 therefor and at the same time cancelling its note to him for $1,000. At the same time Egan's second wife, Carol, his daughter, Marcella, and his son Henry, each were issued 25 shares, all of which were fully paid for. The 250 shares thus issued constituted the sole outstanding stock of Riverview, Inc., and continued to be held as above until Egan's death in 1953. Pieper acquired no stock in Riverview, Inc.

Egan's death was caused in 1953 by a brain tumor. Although unaware of the cause, he began to experience symptoms at least as early as July 1947 when he complained of numbness in his right hand and arm. From that date his symptoms progressively worsened. His facial

352

muscles became somewhat affected in 1947. In 1948 Egan evidenced personality changes which took the form of a lessening of his accustomed "drive." Characteristic of the effects of his illness was the retention of the ability to think analytically but an indifference regarding mental problems. Although Egan was unaware of the cause of his illness during 1947 and 1948, he was greatly perturbed because of its progressive nature and felt the need to arrange his personal estate. To that end, in March 1949, he consulted with an officer of the Northwestern Bank at Minneapolis.

The petitioner states in its reply brief written in view of the foregoing summary of findings that it has no quarrel with any of the evidentiary findings. It contends only that there was no substantial evidence to support the ultimate finding as to the purpose for which the surplus was retained in the corporation and the finding that the taxpayer, after losing its franchise and ceasing to do any selling business, "had no reasonable business needs, either present or prospective" for its surplus.

Although Mr. Egan had died before the case was tried in the Tax Court, the petitioner called witnesses who were very familiar with and testified at length about petitioner's and Mr. Egan's affairs including:

His widow who had had frequent conversations with her husband about his business. His son who had worked summers for taxpayer and later served as an employee and officer and fully understood the business. The bookkeeper and accountant closely associated with petitioner and Mr. Egan many years. The tax accountant who made out income tax returns and acquainted Mr. Egan with the provisions of Section 102 and wrote in December 1948 that immediate consideration should be given to the corporation's financial position and how it might be affected by the provisions of Section 102. The purchaser of the Chevrolet franchise and the corporation's

property who had worked many years with Mr. Egan in the business. The bank official with whom Mr. Egan consulted and co-operated about his estate and the investment in government and other securities of the funds permitted to accumulate in Egan, Inc.

There was no reason to doubt that if Mr. Egan had ever formulated any concrete plans or entered upon any negotiations or taken any definite step to commit the taxpayer and the funds it was holding to the risk of any business so as to create a reasonable need for any such large sum of money as petitioner's surplus in the business, the witnesses would have known it and the trial would have brought it out. There was no evidence to justify such an inference.

■ Our study of the evidence convinces that there was substantial evidence to support the decision of the Tax Court and no clear error has been shown.

Affirmed.