## J. GORDON TURNBULL, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 88456. December 12, 1963.

*W. A. Falsgraf* and *S. E. Parker*, for the petitioner.
*Charles B. Sklar*, for the respondent.

OPINION

*Issue 1*

Section 102(a) of the Internal Revenue Code of 1939 provides that if a corporation is availed of for the purpose of preventing the imposition of surtax on its shareholders by permitting earnings or profits to accumulate instead of being distributed, then the corporation is subject to a surtax on the amount of undistributed section 102 net income. Section 102(c) provides that the accumulation of earnings or profits beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation proves to the contrary by the clear preponderance of evidence.

Under section 534, I.R.C. 1954, which is applicable to this case, if respondent sends the taxpayer a notification of the proposed determination regarding accumulated earnings tax, and in response thereto

the taxpayer submits an *adequate* statement of grounds on which the taxpayer relies, along with supporting facts, then respondent must bear the burden of proving, with respect to the relevant grounds set forth in said statement, that the taxpayer permitted its earnings or profits to accumulate beyond the reasonable needs of its business. To be *adequate* to shift to respondent the burden of proof with respect to the grounds set forth in the taxpayer's statement, the supporting facts submitted by the taxpayer must be substantial, material, definite, and clear. *American Metal Products Corporation*, 34 T.C. 89 (1960), affd. 287 F. 2d 860 (C.A. 8, 1961).

In this case the respondent did, as we have heretofore found, send a notification to the petitioner in accordance with the provisions of section 534; and the petitioner submitted a timely statement in which it purported to set forth certain grounds and supporting facts on which it relies to establish that its earnings and profits had not been permitted to accumulate beyond the reasonable needs of its business during the years in controversy.

But respondent contends that the facts contained in the petitioner's statement dated July 10, 1959, do not meet the requirements of the statute and the regulations and are insufficient to shift the burden of proof to respondent. His contention is based on the following points:

1. All the information submitted by the petitioner regarding cash receipts and disbursements pertain to the fiscal years ended November 30, 1951, and November 30, 1952. It did not submit any such information for its fiscal years ended November 30, 1953, and February 4, 1954, although these years were included in the notice mailed to petitioner on May 11, 1959. That the information submitted was carefully considered by respondent is shown by the fact that the fiscal year ended November 30, 1951, was not included in the notice of deficiency, but petitioner did not submit any information on its cash flow or cash position for 2 of the 3 years now before us.

2. The few allegations contained in the statement regarding the Reynolds plant accident were so vague and indefinite that respondent was not informed as to the basis or reasons for the petitioner's position. Specific facts should be set forth in petitioner's statement, not mere allegations of its contention. See *Wellman Operating Corporation*, 33 T.C. 162, 184 (1959); and *American Metal Products Corporation, supra.* Petitioner's statement contains the following incorrect information: (a) The accident occurred on November 15, 1951, not during petitioner's fiscal year 1953, as stated: (b) the storage silo was not constructed by petitioner; (c) the entire silo did not collapse; (d) "many" construction workers were not killed; (e) only one action for wrongful death was filed, not "numerous wrongful death lawsuits"; (f) the one suit for wrongful death filed named three other parties as codefendants along with petitioner.

The facts omitted from petitioner's statement regarding the accident left respondent completely uninformed concerning it. Petitioner did not name any of the parties involved; where, when, or how the accident occured; what suits had been filed and where; who were petitioner's insurers; the amount of coverage; or that one such company undertook to investigate the accident. Petitioner did not specifiy what prospective purchasers were contacted and any facts as to what happened during any negotiations which might have occurred.

3. Petitioner's stated ground that cash was required for completion of contracts on hand was merely an allegation. No facts were submitted in support thereof. Petitioner offered no explanation of why a business, which was inactive and accepting no new work after April 3, 1953, needed such large amounts of working capital. Petitioner also did not state that on or about July 1, 1953, some of its contracts had been assigned to E. G. Novak for completion.

In view of the foregoing we have concluded that the petitioner's statement was not sufficiently clear and definite to affect a shift in the burden of proof in relation to accumulations beyond the reasonable needs of the business. See *I. A. Dress Co.*, 32 T.C. 93 (1959), affd. 273 F. 2d 543 (C.A. 2, 1960), certiorari denied 362 U.S. 976. However, irrespective of the burden-of-proof issue, we think the record in this case persuasively demonstrates that petitioner's financial position at the beginning of and during the years in question was adequate to meet its business needs, both immediate and anticipated, that additional accumulations were unreasonable, and that the corporation was availed of for the purpose of preventing the imposition of surtax upon its principal shareholders. Cf. *Barrow Manufacturing Co.* v. *Commissioner*, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court.

We turn now to a consideration of the grounds asserted by the petitioner and of the evidence pertinent thereto, bearing in mind that whether a corporation was availed of for the purpose of avoiding the income tax with respect to its shareholders and whether earnings and profits were permitted to accumulate beyond the reasonable needs of the business are both questions of fact. *Helvering* v. *National Grocery Co.*, 304 U.S. 282 (1938), and *James M. Pierce Corporation*, 38 T.C. 643, 652 (1962).

Petitioner argues that it retained certain of its earnings to meet its reasonable business needs for the following reasons:

(a) The nature of petitioner's engineering, consulting, and contracting services required extensive working capital to cover expenditures against work in progress which generally exceeded collections on fees during the greatest portion of the time the job was on the company's books. Such expenditures were required to be made during the progress of the work, but fee collections were almost always

deferred to the close of the job, and in many instances retentions of up to 10 percent of the contract price could be held for extended periods.

(b) Petitioner's cash position during the years here involved was so precarious as to require the establishment of a line of credit for borrowings to meet payrolls and its needs for short-term working capital.

(c) The disaster at Gregory, Tex., on November 15, 1951, confronted petitioner with claims for damages exceeding $500,000, against which it had insurance in force of not to exceed $100,000, the carriers of which had disclaimed liability.

Petitioner further argues that there was a complete absence of intent on its part to avoid the imposition of surtax on its shareholders and that such intent is evidenced by these circumstances:

(a) During the period from 1947 until the death of J. Gordon Turnbull, the petitioner had paid substantial cash dividends whenever its cash position was such that they were warranted.

(b) After the date of death of J. Gordon Turnbull, the petitioner was in a de facto status of liquidation, and distribution of its assets could have been accomplished at any time with favorable capital gain treatment to its shareholders.

(c) The plan proposed by certain of its employees involving a stock purchase followed by a redemption of the remaining shares held by the Estate of J. Gordon Turnbull and his widow was deemed by Internal Revenue Service in its ruling letter to be a partial liquidation within the meaning of section 115(c) of the Internal Revenue Code of 1939.

(d) Petitioner was not liquidated because of the value of the corporate entity with its charter permitting the rendering of engineering services and because of the potential transferee liability to the Estate of J. Gordon Turnbull and his widow from the Texas litigation.

*Working capital requirements and cash position.*—The record reveals that for its 6 fiscal years ended November 30, 1947, through November 30, 1953, the petitioner had total current earnings available for dividends of $599,180.48, from which it paid dividends of $89,495, or a total of 14.94 percent. It is apparent, as shown in our Findings of Fact, that the largest part of these dividends was paid before 1951. But even more significant is that for the latter 3 fiscal years, the petitioner had current earnings available for dividends of $238,751.72, and paid only one dividend in 1952 of $16,240, or only 6.80 percent. While in its fiscal year ended November 30, 1952, the first year at issue here, the petitioner paid out a large part of its earnings in dividends, for its next year ended November 30, 1953, it had much larger current earnings available ($117,350.69), but paid no dividends at all. Thus, during the years November 30, 1952, and November 30, 1953, the peti-

tioner's retained earnings, even after the 1952 dividend, increased $4,917 and $117,350.69, respectively, or a total of $122,267.69.

Petitioner's cash basis balance sheets for these 2 years indicate that as retained earnings increased in such substantial amounts, the corporation's financial condition was both sound and liquid, and that its cash position was particularly strong. At the end of each of these 2 years, petitioner had no current liabilities other than accrued taxes; its current assets exceeded its total liabilities in each year by $301,349.91 and $543,686.43, respectively; and it had cash in excess of total liabilities in each year of $108,579.91 and $472,335.42, respectively. Its current ratio was 11.12 to 1 at November 30, 1952, and 6.97 to 1 at November 30, 1953. Moreover, the ratio of cash to current liabilities was 5.73 to 1 and 6.18 to 1 in these years. Petitioner's cash position was so strong that it could have easily paid all its liabilities and had excess cash of over $108,000 as of November 30, 1952, and over $472,000 as of November 30, 1953. In light of these facts, we are not persuaded that petitioner had any kind of cash problems, let alone that its cash position was precarious. Its working capital appears to have been entirely adequate for its needs.

That petitioner engaged in some short-term borrowing does not detract from the fact that its working capital was more than adequate. Only two loans were made in fiscal year 1952 for about 60 days each. The four loans made in fiscal year 1953 were all in the first part of the year and were for terms of 14, 4, 6, and 13 days, respectively. The fact that petitioner could obtain such loans and repay them in only a few days indicates the strength rather than the weakness of its finances. See *Kerr-Cochran, Inc.* v. *Commissioner*, 253 F. 2d 121 (C.A. 8, 1958), affirming a Memorandum Opinion of this Court, involving quick bank loan repayments.

On an accrual basis, petitioner's financial condition at November 30, 1953, was even better than on a cash basis. The ratio of current assets to current liabilities was 100.16 to 1; the ratio of current assets to total liabilities was 2.67 to 1; the ratio of cash to current liabilities was 43.88 to 1; and the ratio of cash to total liabilities was 1.17 to 1.

By February 4, 1954, petitioner's liquidity and cash position was enhanced by Susan A. Turnbull's purchase, for cash, of various fixed assets owned by the petitioner at their book value as of December 31, 1953, in the total amount of $240,120.40.

At its meeting on January 18, 1954, the board of directors of H. R. Henderson & Co., in considering the possibility of purchasing the stock of petitioner, knew and took special recognition of the fact that in the event of such a purchase, it would be possible for Henderson to obtain a large part of the purchase price from petitioner. Similarly, on February 4, 1954, petitioner's board of directors recognized its cash position was such that it could loan $800,000 to H. R. Hender-

son & Co. This loan was utilized by Henderson in its purchase of petitioner's stock. As part of the purchase of its stock, petitioner actually loaned H. R. Henderson & Co. $801,108.37, and in addition paid $148,891.63 to the Estate of J. Gordon Turnbull, in order to acquire 248 shares of its own stock to be held as treasury shares. Thus, petitioner's accumulated earnings were utilized to finance the sale of petitioner's outstanding stock from Susan A. Turnbull and the Estate of J. Gordon Turnbull, petitioner's only stockholders, to H. R. Henderson & Co. We think this use of accumulated corporate earnings was essentially for the personal benefit of petitioner's stockholders and was the final step in the plan to avoid the imposition on these stockholders of surtax on accumulated corporate earnings. In our opinion, such a use indicates that the earnings and profits of the corporation have been accumulated beyond the reasonable needs of the business. See *Pelton Steel Casting Co.* v. *Commissioner*, 251 F. 2d 278 (C.A. 7, 1958), certiorari denied 356 U.S. 958.

Still another reason why petitioner's working capital was not inadequate during its taxable years ended November 30, 1953, and February 4, 1954, is that after the death of J. Gordon Turnbull on April 1, 1953, petitioner's operations were greatly curtailed. Petitioner accepted no new work from April 1, 1953, through February 4, 1954. Additionally, on or about July 1, 1953, the petitioner assigned the uncompleted contracts in its Kansas City office to E. G. Novak, the manager of its Kansas City office, for completion. Petitioner therefore did not have any financial burden in connection with the completion of these jobs during the latter part of its fiscal year 1953.

During 1953 the petitioner was in the process of winding up its affairs, although no formal plan of liquidation had been adopted. The mere fact that a corporation is in the process of liquidation or winding up its affairs does not prevent the application of the tax on unreasonable accumulations of earnings. To the contrary, if a taxpayer's business has terminated or become inactive, usually there is no longer any reasonable business need for retaining accumulated earnings. In *Egan, Inc.* v. *Commissioner*, 236 F. 2d 343 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court, the accumulated earnings tax was imposed where the corporation had ceased doing business upon the termination of its franchise during the taxable year. See also *Eastern Railway & Lumber Co.*, 12 T.C. 869 (1949).

*Possible liability on tort suits.*—Although petitioner earnestly contends that it was compelled to maintain large cash reserves to meet any contingent liability it might have had on the tort suits arising out of the accident at the Reynolds plant, we are satisfied that the

evidence establishes that petitioner's belief was groundless and unfounded. We do not regard this as a realistically foreseeable contingency in view of all the facts and circumstances involved. The cases relied on by the petitioner, namely, *Casey* v. *Commissioner*, 267 F. 2d 26 (C.A. 2, 1959), and *William C. Atwater & Co.*, 10 T.C. 218 (1948), involved facts which differ substantially from those present in the instant case and, consequently, are distinguishable. In *Casey*, a suit filed by the estate of Brian T. Moran, a former employee of Bankers Development Corp., to recover claimed commissions was on appeal to the Court of Appeals of the State of New York; and in the *Atwater* case, where a large judgment would have to have been paid if an appeal were unsuccessful, an attachment of bank accounts already had been made, thus indicating the reality of the need. We are more inclined here to give considerable weight to evidence bearing on the likelihood of the occurrence of the contingency, even though we are cognizant of the normal uncertainties of litigation. Cf. *Oyster Shell Products Corporation* v. *Commissioner*, 313 F. 2d 449 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court; *Gibbs & Cox* v. *Commissioner*, 147 F. 2d 60 (C.A. 2, 1945) ; and *Trico Products Corporation* v. *McGowan*, 169 F. 2d 343 (C.A. 2, 1948).

This record shows that the petitioner was in no way responsible for the accident, which had occurred when a scaffolding or platform supported by reinforcing bars extending inside an ore storage silo collapsed injuring about 22 employees of James Stewart Co. James Stewart Co., which had drawn the plans for the actual construction of the silo, had complete control over the method of construction utilizing the platform supported by reinforcing bars. This method was not specified by petitioner and was not part of its design. As architectural engineer, petitioner's responsibility was limited to drawing plans for the finished product, the design of the entire plant, and its duty of inspection was merely to determine that the finished product complied with their plans and specifications. Petitioner had no control over any subcontractor or his method of installation. The circumstances under which the accident occurred made any liability by petitioner highly improbable.

From his study of the case and investigation of the accident, Hubert L. Stone, attorney for each of the plaintiffs in the tort suits believed when he filed the suits that he had the best chance of recovery against the parties defendant other than the petitioner and at no time did he feel he had sufficient evidence even to establish a prima facie case against petitioner. It was only because of a rule of Texas procedure that he even named petitioner as a codefendant.

The record also shows that at no time were the officers and directors too concerned about any liability as a result of the Reynolds plant accident. Their lack of concern is evidenced by the fact that although the accident occurred on November 15, 1951, they did not notify either of their two insurers of the accident until January 13, 1953.

One of petitioner's insurers disclaimed liability under its policy and the other (Employers Casualty Co.) undertook to investigate and defend the case after receiving a nonwaiver of rights agreement. Petitioner's attorneys, Falsgraf, Reidy and Shoup, believed the disclaiming company was still liable under the provisions of the insurance policy and had no grounds for disclaiming liability.

After its investigation was completed about January 29, 1954, Employers Casualty Co. concluded there was no liability against petitioner on the lawsuits. In spite of the size of the alleged damages, Security Mutual Casualty Co., reinsurer for Employers Casualty Co., with knowledge of the facts, did not request Employers to take any special action because it appeared doubtful to them that petitioner was guilty of any negligence.

Although actual settlements of the suits were negotiated over a period of months, all were settled by October 1954, and judgments were entered on November 1, 1954. In settlement of the suits, Employers Casualty Co. paid only $5,000 on behalf of petitioner and obtained releases in all the cases. A total of $44,350 was paid by or on behalf of the other defendants, and all the lawsuits were therefore settled by all the defendants for a total payment of $49,350. Neither the petitioner nor Price Construction Co. ever made any payment as a result of the Reynolds plant lawsuits.

Furthermore, in its accrual basis balance sheet of November 30, 1953, the petitioner showed many reserves for various expenses, including a $10,000 reserve for legal expenses on suits, but no reserve was established for any contingent liability on the lawsuits filed as a result of the Reynolds plant accident.

The foregoing facts convince us that petitioner at no time had any appreciable contingent liability on the tort suits, and that petitioner's officers and directors were well informed as to all the facts regarding the accident as well as the extremely small chance of petitioner's having any liability with regard thereto. Reasonable business needs do not include the retention of earnings and profits to provide against such unrealistic contingencies. Moreover, whatever possibility of loss might have existed was more than adequately provided for by the earnings which petitioner had accumulated by November 30, 1951, prior to the years before us, which amounted to $546,144.61. It is recognized that prior years' retained earnings should be taken into consideration in determining whether the retention and accumulation of

current year's earnings is required by the reasonable needs of the taxpayer's business. *Casey* v. *Commissioner, supra.*

*Other factors.*—While petitioner's business was to provide architectural and engineering services, it invested large sums in real estate unrelated to its business. The most significant of these unrelated investments was a ranch, or farm, in San Fernando, Calif., in which petitioner invested $119,625, and which was sold to Susan A. Turnbull for cash at its book value as of December 31, 1954. This property was operated as a farm and crops were grown on it for a few years. This large investment of funds in property unrelated to petitioner's business indicated that petitioner was accumulating its earnings beyond the reasonable needs of its business. See *J. M. Perry & Co.* v. *Commissioner*, 120 F. 2d 123 (C.A. 9, 1941) ; and *Raymond I. Smith, Inc.*, 33 T.C. 141 (1959), affd. 292 F. 2d 470 (C.A. 9, 1961). This is another crystallizing agent for persuasion as to the lack of reasonable business needs.

During petitioner's fiscal year ended November 30, 1952, J. Gordon Turnbull received a salary of $60,000. For the fiscal year ended November 30, 1953, petitioner paid J. Gordon Turnbull a salary of $35,000 and Susan A. Turnbull a salary of $12,500. These salaries, which were included in the deduction for compensation of officers claimed on petitioner's income tax return for each year, show that J. Gordon Turnbull and his wife, who were the sole stockholders of petitioner, were in a tax bracket of approximately 67 percent and 66 percent for the years 1952 and 1953. Consequently, the retention of earnings by the corporation represented a substantial tax savings to petitioner's stockholders. See *McCutchin Drilling Co.* v. *Commissioner*, 143 F. 2d 480 (C.A. 5, 1944).

Looking as we do at the totality of the evidence, we hold for the respondent on this issue.

*Issue 2*

With respect to the question involving the deductibility of the professional fee paid to J. K. Lasser & Co., the petitioner asserts that the payment was made under such circumstances and at such time as to encourage some of its key employees to remain in their same positions with its new owners. Therefore, the petitioner contends that the payment is analogous to the creation of a profit-sharing trust for the benefit of corporate employees or other employee benefits designed to encourage loyalty and continuity of service and, as such, it constitutes an ordinary and necessary expense of this petitioner. Respondent, on the other hand, contends that this paid fee is not an ordinary and necessary expense of petitioner because (1) the services for which the charge was made had been rendered to the petitioner's employees and for

their benefit rather than to the corporation or for its benefit, and (2) the bill was not paid until after February 4, 1954, and thus was not deductible by petitioner, a cash basis corporation, in its taxable year ended February 4, 1954.

We agree with the respondent. According to the testimony of petitioner's witness, W. A. Falsgraf, J. K. Lasser & Co. was retained by the employees and rendered services to them for their benefit, not to petitioner corporation or for its benefit. Falsgraf himself at first refused to let petitioner pay this bill because it was an obligation incurred by the employees. Legal fees paid on behalf of, and for services rendered to, another are generally not deductible as ordinary and necessary expenses of the payer. See *Royal Cotton Mill Co.*, 29 T.C. 761 (1958); and compare *Schalk Chemical Co.*, 32 T.C. 879, 889 (1959), affd. 304 F. 2d 48 (C.A. 9, 1962); *Standard Linen Service, Inc.*, 33 T.C. 1, 17 (1959); and *Baxter D. Whitney & Son, Inc.*, 20 B.T.A. 380 (1930). Our review of prior decisions relating to this particular area of the law convinces us that this expense should not be allowed to petitioner. To be sure, this situation is unlike *Champion Spark Plug Co.*, 30 T.C. 295 (1958), where the taxpayer's payment of $33,750 to an employee disabled because of illness was held to be an ordinary and necessary business expense; or *Cecil R. Hopkins*, 30 T.C. 1015 (1958), where deposits made by the taxpayer at Christmas in savings accounts for children of its employees were treated as proximately related to the taxpayer's business and therefore deductible as ordinary and necessary expenses. The mere fact that the employees might have resigned if the corporation had not paid their obligation is not, in our opinion, sufficient to qualify the payment as an ordinary and necessary expense of petitioner. A taxpayer may not assume the deductions of another by the simple expedient of payment.

Falsgraf also testified that J. K. Lasser & Co. sent the bill in question to W. D. McArthur, the employee's representative, after H. R. Henderson & Co. had acquired petitioner's stock, and that Cameron McElroy, who was just getting started in the operation of petitioner, authorized the payment. Since H. R. Henderson & Co. did not acquire the stock of petitioner until February 4, 1954, and since the bill was not received and payment was not made until after that date, petitioner, being on a cash basis, could not in any event, properly claim a deduction in its taxable year ended February 4, 1954. Accordingly, respondent is sustained on this issue.

To reflect adjustments contained in the stipulation of the parties,

*Decision will be entered under Rule 50.*