Henry Van Hummell, Inc. v. Commissioner.
Henry Van Hummell, Inc. v. Commissioner
Docket No. 94312.
United States Tax Court
T.C. Memo 1964-290; 1964 Tax Ct. Memo LEXIS 49; 23 T.C.M. (CCH) 1765; T.C.M. (RIA) 64290; November 5, 1964
*49 Petitioner, a family-owned corporation engaged in the business of representing a group for insurance purposes and acting as an insurance agent for insurance companies, retained a substantial portion of its earnings and profits for the years 1956 through 1959. It had previously accumulated a large earned surplus over a period of years. During this period petitioner paid substantial dividends and large salaries and bonuses to its stockholder-officers. It also made substantial loans to an unaffiliated, inactive corporation, owned by the same family, of which it later acquired control. Held: The amounts of retained earnings in the years before us represented unreasonable accumulations of earnings and profits beyond the reasonable needs of petitioner's business. Held, further, petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders. *50 Morrison Shafroth, Equitable Bldg., Denver, Colo., John N. Dahle, and James H. Skinner, Jr., for the petitioner. Richard J. Shipley, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in petitioner's income taxes for the indicated years as follows: *51 Year
Deficiency
1956
$35,065.20
1957
60,538.25
1958
28,843.11
1959
22,758.04
The sole issue before us is whether petitioner is subject to the accumulated earnings tax imposed by sections 531 to 537, inclusive, of the 1954 Internal Revenue Code, [1] with respect to all or any part of its retained earnings for the years in question. *52 Findings of Fact The parties have stipulated some of the facts which are found accordingly. Petitioner, Henry Van Hummell, Inc., is a Colorado corporation organized in 1928, with its principal office at 444 Sherman Street, Denver, Colorado. It filed its income tax returns for the years here involved with the district director of internal revenue at Denver, Colorado. Petitioner's articles of incorporation provided that in addition to the general powers granted to corporations under Colorado law, its object is to engage in the insurance brokerage business, acting as agent for various associations of persons in procuring group and other insurance for their members and also acting as agent for insurance companies in securing business for them. The articles also provided for capital stock of $50,000 divided into 500 shares at a par value of $100 per share. Although initially a controlling stock interest in petitioner was owned by Henry Van Hummell and his wife, Iona, for many years prior to the years before us and through the year ended December 31, 1957, petitioner's stock was owned exclusively by their daughter, Virginia Van Hummell Howard, by members of her family and by related *53 interests. Virginia at all pertinent times owned in excess of 50 percent of petitioner's stock, and the balance until 1958 was held by her as trustee for her children, [2] by her husband, Thomas L. Howard, Jr., and by the Van Hummell-Howard Foundation. In the years 1958 and 1959, following a recapitalization in which two classes of stock were authorized, the Howard family and related interests owned practically all of the stock of petitioner. They owned all of the issued Class A voting stock and some of the Class B. Small amounts of Class B nonvoting stock were owned by some of petitioner's employees. At all pertinent times during the years before us Virginia Howard was president of petitioner and T. L. Howard, Jr., was executive vice president. Since its inception, when capital of $50,000 was invested, contributions to the capital of petitioner have been principally derived from transfers to capital from retained earnings as a result of stock splits and nontaxable stock dividends as follows: 1948
4 for 1 stock split
$200,000
1954
100 percent stock dividend
266,700
1955
10 percent stock dividend
53,580
1956
5 percent stock dividend
29,470
1957
10 percent stock dividend
62,420
Total
$612,170
*54 A total of $33,830 had also been paid in by the Howard interests in the period from 1948 to 1958 for additional shares acquired by them. At the time of the recapitalization in December 1958 petitioner's paid-in surplus account showed a balance of $85,031.16 and the new Class A common stock account was credited with $2,000,000 broken down as follows: From capital stock issued
$ 696,000.00
Paid-in surplus
85,031.16
Retained earnings
1,218,968.84
Petitioner is primarily engaged in the business of acting as fiscal agent for and handling the affairs of the Federal Postal Employees Association, referred to hereinafter as FPEA, a Colorado nonprofit corporation. FPEA's membership consists of public employees, Federal, state, county and municipal, throughout the United States (excluding armed forces enlisted personnel), and to its members FPEA offers group life and income protection insurance. The representation of FPEA has always been petitioner's primary activity and it is conducted under a contract which runs until 1987. In addition petitioner realizes income from brokerage commissions from insurance companies, from rents, from fees as fiscal agent and from investments. *55 Petitioner's income has increased steadily throughout the years of its existence from a gross of $65,361 and a net of $27,455 in 1928 on which no income taxes were paid to a gross of $1,555,704 and a net of $515,376 in 1959 on which income taxes of $249,213 were paid. There has been a corresponding increase in petitioner's expenses also throughout the years, from $37,906 in 1928 to $1,040,328 in 1959. In spite of a consistent cash dividend paying policy through the years with an increase from $27,455 paid in 1928 to a top of $186,375 paid in 1958, petitioner has also been fairly consistent in retaining a part of its earnings annually since 1930; no cash dividends were paid in that year and for the succeeding two years. In four years during the period from 1928 to 1959, cash dividends in excess of net income for the year were paid. All told, cash dividends from a top of 143.56 percent of annual net earnings to a low of 28.09 percent have been paid by petitioner in the period from 1928 to 1959. Retained annual earnings for the period also have varied from a top of 100 percent to a low of.61 percent and total approximately $2,000,000. The total net income and dividends paid for the *56 years 1956 to 1959, inclusive, were as follows (cents omitted): Ratio of
Net Income
Divi-
Dividends
After
dends
to Net
Taxes
Paid
Income
1956
$309,381
$185,661
60.01%
1957
305,919
127,863
41.80%
1958
278,406
186,375
66.94%
1959
266,163
165,956
62.35%
Cash dividends paid from the year in which petitioner started business through 1962 amounted to $3,518,692, 60.52 percent of its net income after taxes. In the 1956-1959 period the average ratio of dividends paid to net income was 57 percent, the same as the percentage for all corporations in the United States during that period. The corporation also paid large salaries to its officers. During the years here involved salaries paid to Thomas L. and Virginia V. H. Howard were as follows: 1956
$ 87,000.00
1957
112,000.00
1958
95,201.95
1959
110,406.90
These amounts term "salaries" included annual bonuses which were regularly paid pursuant to long established company policy to executive officers and which were based on a percentage of company profits. Petitioner's deductions for salaries paid to the Howards were reduced by the amounts shown in the statutory *57 notice under a compromise agreement with the Internal Revenue Service as follows: 1956
No reduction
1957
$15,000.00
1958
No reduction
1959
$13,406.90 No issue is raised with respect to these reductions in this proceeding. The total amount of petitioner's earnings and profits accumulated since inception of its business, including the amounts capitalized, as of December 31st of each year indicated, were as follows: 1956
$1,558,850
1957
1,745,011
1958
1,838,329
1959
1,925,392
Petitioner's tax returns for the years here involved disclosed the following amounts of earned surplus and undivided profits after adjustments for transfers to capital stock at the end of each year: 1956
$1,009,100.40
1957
1,132,841.88
1958
7,190.18
1959
94,253.67
If the petitioner's retained earnings as determined by respondent during each of the years involved had been distributed in the same proportion as the dividends actually paid, the Howard family interests would have been liable for the following amounts of additional personal income tax: Respondent's De-
termination of
Howard Fam-
Retained
Additional In-
ily's Addi-
Earn-
come to How-
tional
Year
ings
ard Family
Tax
1956
$119,649
$114,756
$ 78,179
1957
185,813
177,136
115,101
1958
103,488
99,183
67,587
1959
82,756
79,073
48,504
*58 Net current assets [3] of petitioner as of the close of each of the years in question were as follows: 1956
$472,070
1957
638,599
1958
417,062
1959
893,637
Petitioner held investments in stocks and Government bonds at the end of each of the years in question as set forth below at cost: 1956
1957
1958
1959
U.S. Government Securities
$406,480
$354,319
$ 661,478
$ 285,896
Municipal Bonds
10,223
10,223
Stock of Willows Realty and
Invest-
ment Company
190,000
655,499
Stock of Colorado National
51,695
51,695
51,695
51,705
Bank
Stock of Procter & Gamble
3,218
1,609
1,609
1,609
Stock of General Electric Co.
2,350
1,566
1,566
1,566
Stock of Fundamental
18,572
19,706
20,294
21,065
Investors
Stock of Boston Fund, Inc.
76,590
76,590
76,590
78,901
Stock of Kayser-Roth Corp.
49,340
Total at Cost
$558,905
$505,486
$1,013,455
$1,155,804 All of these investments except the stock of Willows Realty and Investment Company were readily *59 convertible into cash. Of those marketable investments none, with the exception of the Kayser-Roth Corporation stock, [4] was so integral to the reasonable needs of petitioner's business that it could not have been liquidated at any time to pay expenses or dividends. For convenience, hereinafter, all of the investments other than the Kayser-Roth Corporation and Willows Realty and Investment Company stocks will be referred to as "liquid investments." The total liquid investments at cost and at market value as of December 31st of each of the years in question were as follows: 1956
1957
1958
1959
Cost
$558,905
$505,486
$823,455
$450,965
Market Value
717,406
646,149
969,218
642,419 The sum of the net current assets plus the liquid investments represents the net liquid assets available to meet ordinary cash operating expenses and reasonably expectable and preplanned extraordinary expenses. The net liquid assets available [5] as of *60 December 31 of each of the years in question were as follows: 1956
$1,189,476
1957
1,284,748
1958
1,386,280
1959
1,536,056 Actual cash operating expenses each year provided a reasonable estimate of the ordinary cash operating expenses for the following year for which liquid assets would be needed. Actual ordinary cash operating expenses [6] for each of the years in question were as follows: 1956
$647,170
1957
698,639
1958
821,740
1959
832,633
*61 Throughout the years of its operation, petitioner has borrowed funds on many occasions, in most instances between the months of March and September when the bulk of its income consisting of a "mortality refund" on its group life policies is received. In the period from 1951 through 1962 these borrowings were in the amount of $900,000, on short-term unsecured notes, at low interest, all paid before their respective due dates. There were no corporate borrowings in the years here involved, but it is clear that almost unlimited credit was readily available to petitioner on very favorable terms at all pertinent times. During 1957 petitioner entered a contract to purchase a major list of prospective customers. As of December 31, 1957, it was anticipated that this contract would result in an extraordinary expense of about $180,000 to be paid within the following 12 or 14 months. In 1951 petitioner constructed a flagstone building on property at 444 Sherman Street, Denver, leased from Willows Realty and Investment Company. [7] This building, which has housed petitioner's business since its completion, was depreciated by petitioner on a straight-line basis from June 1951 through December *62 1959. The total accumulated depreciation on this building at the end of 1956, 1957, and 1958 on the petitioner's books was, respectively, $217,514, $255,996, and $294,479. All of the outstanding stock of Willows was owned by the Howard family from 1954 to 1958. Virginia Van Hummell Howard owned in excess of 80 percent of all of Willows stock during 1956 and 1957. In 1957 petitioner loaned Willows approximately $150,000 on an unsecured 5 percent promissory note due July 1, 1960. At this time Virginia owned in excess of 50 percent of petitioner's stock and, as we have indicated elsewhere in our findings, her family and related interests owned the rest. As of December 31, 1957, the balance due on this note was in excess of $145,000. In March of 1958 petitioner acquired $190,000 worth of Willows stock, paid for in part, to the extent of some $145,000 at least, by cancellation of the Willows note. This gave petitioner an 80.18 percent controlling interest in Willows. At the end of 1959 petitioner's building together *63 with its improvements was sold to Willows for Willows stock. [8] The stock acquired in this transaction, together with the amount acquired in 1958, gave petitioner 92 percent of Willows' outstanding stock. The total accumulated depreciation on the buildings owned by Willows as shown by its tax returns for 1958 and 1959, the two years in question in which petitioner owned more than 80 percent of its stock, was $86,598 and $504,280, [9] respectively. Willows was organized in 1954 and took title to various real properties formerly owned by Virginia Van Hummell Howard. In none of the years before us did it employ any help; it paid no salaries to its officers who were also officers of petitioner, and it paid no other salaries or wages to other employees; its only income consisted of rents and interest and its only expenses consisted of *64 repairs, taxes, interest, insurance, utilities, janitorial service, and similar charges; it contracted out its janitorial service and so it did not even have custodial employees; all of its fiscal affairs were handled and managed by petitioner which acted as its fiscal agent for a fee. Willows was not engaged in the active conduct of a trade or business in any of the years 1956 through 1959. Several of the above findings are summarized in the following table: 1
2
3
Total
Net Liquid
Retained
Earnings And
Assets [1]
Earnings
Profits
Available
Which
Accumulated
To Meet
Respondent
Since
Business
Has Deter-
Inception
Needs
Of The
mined Should
Business
Have Been
(Including
Amounts
Distributed
Capitalized)
As of
Dec. 31, 1956
$1,558,850
$1,189,476
$119,649
Dec. 31, 1957
1,745,011
1,284,748
185,813
Dec. 31, 1958
1,838,329
1,386,280
103,488
Dec. 31, 1959
1,925,392
1,536,056
82,756
4
5
6
7
Net Liquid
Actual
Reasonably
Total Needs
Assets [1]
Ordinary
Expectable
Of Business
Available
Cash Oper-
To Meet
ating
Extraordina
For Liquid
Following
Expenses
ry Expense
Assets
Year's
For Year [2]
(Col.
Needs If
5 Plus Col.
Retained
6)
Earnings
Had Been
Distributed
(Col. 2
Minus Col.
3)
As of
Dec. 31, 1956
$1,069,827
$647,170
$647,170
Dec. 31, 1957
1,098,935
698,639
$180,000
878,639
Dec. 31, 1958
1,282,792
821,740
821,740
Dec. 31, 1959
1,453,300
832,633
832,633
*65 Petitioner's primary activity through the years has been the direct mail solicitation of new members for the FPEA and the collecting of premiums from its members. Petitioner, as broker, receives commissions from the insurance carrier, General American Life, for insurance sold under the group contract to FPEA members, but the greatest portion of its income is received in the form of a "mortality refund." The annual mortality refund is the amount of the group premiums remaining after the payment of all insurance claims (by the carrier) during the year, after all brokerage commissions, and after a 12 percent handling charge paid to General American Life. This remainder is technically paid to FPEA, but it is transferred immediately to the petitioner in partial payment for petitioner's services pursuant to the fiscal agency contract between it and FPEA. The annual mortality refund is usually received by petitioner in September. Petitioner also receives small *66 amounts of income in the form of dues from FPEA members, rents, interest and dividends, but of the total income for the years in question, the mortality refund represents approximately 70 percent. Petitioner's income was subject to the fluctuations in the mortality rate of the FPEA members, since the annual mortality refund is basically the total premiums less death benefits paid. However, in the 20 years prior to the period in question, the ratio of death claims to total insurance in force varied only between.818 percent and 1.114 percent. In the same period the annual ratio of net income before taxes to total claims ranged between 8.4 percent and 39.9 percent, and in the period 1956-1959, between 23.4 percent and 35.5 percent. Thus, as of the beginning of 1956, 20 years' experience showed that mortality would have to increase at least 8.4 percent before there would be the slightest possibility that the profit-making position of the company would be endangered. In the years in question it turned out that mortality would have to have increased at least 23.4 percent before petitioner experienced a deficit. In the 20-year period between 1936 and 1956, the mortality refund received *67 by petitioner under its FPEA contract increased from $106,369 to $996,582, and in only a few instances did it evidence a decrease from year to year. In 1937 it dropped to $84,559 but climbed again in 1938 to $156,196. In 1942 it dropped from an all-time high of $362,968 in 1941 to $204,344, but it then immediately climbed back to $355,402 in 1943. Its rate of growth thereafter for the next 10 years was relatively steady until the mortality refund for 1954 broke the previous record by reaching $1,059,786. In each of the years before us and in the following three years, 1960 through 1962, it continued to exceed $1,000,000 in each year. Under the arrangement between petitioner, FPEA, and General American, General American had the exclusive right to raise or lower the rates of premium paid by FPEA members. Any lowering of the rate by General American would automatically reduce the mortality refund and the gross income of petitioner. However, the basic premium charge remained the same from 1927 through 1961. In 1962, after extensive negotiations between petitioner and General American, a new plan for coverage was initiated in an attempt to lighten the high premium burden on the older *68 members of the group. It was not established that this new plan involved a rate reduction as such. In 1947 or 1948 the Colorado legislature passed a law which limited individual policies in groups such as FPEA to a maximum of $3,000 for active employees and $1,000 for retired employees, and required that all premiums be collected only through payroll deductions. FPEA policies have a $5,000 maximum and premiums are not collected through payroll deductions. However, as long as the basic contract between FPEA and General American is not changed, the Colorado law is not likely to be enforced against it, since the contract was made some 20 years prior to enactment of the legislation, which contained a "grandfather clause" excepting pre-existing arrangements from its requirements. Legislation in some other states has barred petitioner from soliciting new FPEA members. Petitioner cannot deal in life insurance in 3 states, and for a period was barred from dealing in 2 others. Several states have laws which require petitioner, as a nonresident broker, to split its commissions earned in the state with a resident broker who contributes nothing to the solicitation of the business. Much of *69 the state legislation is imposed only upon groups formed for the sole purpose of setting up a group insurance policy and the FPEA is such a group. Petitioner has faced increasing competition in the group insurance field. In 1954 the Federal Government adopted a group insurance plan for its employees. This plan has caused a very substantial reduction in Federal employee membership in FPEA. After the Federal plan was adopted, several state and local governmental bodies also inaugurated plans for their employees, thus offering further competition to FPEA for new members. Any system of group insurance requires a constant inflow of new, young, and healthy members. As the composition of the group grows older the percentage of premiums paid out in claims increases, until it reaches the point where the group will cease to exist. Ever since the inauguration of the Federal plan, the directors of petitioner have feared crippling competition. However, petitioner's business since 1954 has not diminished but has increased. The insurance in force has increased every year, from $158,238,180 in 1954 to $190,365,000 in 1961, decreasing only in 1962 to $186,037,100. Petitioner's mortality refund during *70 6 of the 8 years following the inauguration of the Federal group plan was greater than that of the peak year prior to that inauguration. To overcome some of these hazards the petitioner considered, with varying degrees of seriousness, means to improve its competitive position and to diversify its operations. One action taken was the signing of a contract in 1957 for the purchase of a major new prospect list expected to eventually cost $180,000. A major move toward diversification was the acquisition of a controlling interest in Willows. Some consideration was also given to the establishment of a savings and loan association, and, alternatively, to entering a joint venture with an existing association under which petitioner hoped to attract new FPEA members. Members would be offered a savings-by-mail plan, and their insurance premiums could be deducted directly from their savings accounts, thus eliminating billing by petitioner. However, these ideas were never mentioned at a board of directors meeting during the tax years in question. It was not until the May 19, 1960, meeting that such ideas were brought up and then only as a report of a "possibility" for diversification considered *71 by T. L. Howard. No action was taken by the board and no plans were formulated. Subsequently, in 1960, the idea was dropped after rejection by the board of directors of FPEA. A project was begun in 1955 involving direct mail sales of a mutual investment fund. It was contemplated that there be three direct solicitations at a cost in excess of $100,000. However, a test mailing proved unsuccessful, and so after an initial expenditure of $33,500 for the first test mailing, the project was dropped in 1956. In 1958 a motion picture about the Civil Service was produced by petitioner at a cost of $39,000, and was subsequently shown throughout the country. The film produced no income, but petitioner derived good will and improved public relations from the project. No other similar films were planned or produced although there were several discussions in subsequent years. Discussions were held during the period in question with Kayser-Roth Corporation in an effort to establish a plan for direct sales of Kayser-Roth products at a discount to FPEA members. Petitioner invested approximately $50,000 in Kayser-Roth stock in 1959 so as to strengthen its position in the negotiations. However, *72 no concrete plans were ever made, since Kayser-Roth refused to sell its products at a discount. No mention of any contract with Kayser-Roth appears in the minutes of petitioner's board meetings, and no anticipated costs of this diversification were ever provided for. In 1956 the controller of petitioner was directed by the board of directors to study the needs of the business for a new system of IBM equipment. Throughout the period 1956-1959 the company was considering the rental (at approximately $7,200 per month, or $43,200 annually above the rental cost of the old equipment in use) or purchase (at approximately $270,000) of new equipment. A rental order was placed in 1960 but not filled because of inability of the equipment to perform the exact process needed in petitioner's operation. No other definite or firm plans to purchase this equipment were made in the years in question. By the nature of petitioner's direct mail solicitation operation, and because it produced a monthly magazine for the FPEA membership, a great deal of printed material had to be purchased. When dealing with printers, the petitioner often received poor service, delayed deliveries, etc. Partly to eliminate *73 this problem and partly as a method for diversification of its business, the petitioner in 1959 investigated the possibility of investment in a local printing company. It was contemplated that a maximum of $100,000 might be invested if the proper opportunity arose. In December 1959, the investment was merely in the investigatory stages, and the financial statements show no accounting provision made for the possible $100,000 investment. In 1960 the idea was dropped when the only printing company which was a prospective candidate for the plan refused petitioner's proposals. By registered letters dated May 14, 1959, and October 12, 1960, respondent notified petitioner, in accordance with section 534, of his proposal to issue a statutory notice of deficiency for the years 1956, 1957, 1958, and 1959, which included an amount with respect to the accumulated earnings tax imposed by section 531. Petitioner timely submitted to the district director of internal revenue its statement of the grounds on which it relied to establish that none of its earnings or profits had been allowed to accumulate beyond the reasonable needs of its business along with the supporting facts. Ultimate Findings *74 of Fact In each of the years in question, petitioner has allowed its earnings and profits to accumulate beyond the reasonable needs of its business. In each of the years in question petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Opinion Sections 531 and 532 impose an additional accumulated earnings tax upon corporations availed of for the purpose of avoiding the income tax with respect to their shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 533 provides that the fact that corporate earnings are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders unless the corporation shall prove to the contrary by the preponderance of the evidence. Under section 534 the burden of proof in proceedings *75 before us is placed upon the respondent with respect to allegations that corporate earnings have been permitted to accumulate beyond its reasonable business needs if the taxpayer after notification by respondent of his intention to impose the accumulated earnings tax has submitted a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of its earnings have not been permitted to accumulate beyond its reasonable business needs. Reasonable needs of the business are defined by section 537 to include reasonably anticipated needs of the business. Here respondent sent notification to petitioner pursuant to section 534 and petitioner in turn filed timely statements in response thereto. Respondent contends that the statements and facts therein contained are not adequate to meet the requirements of section 534 and the regulations; that the facts given are too vague and general and that the statements are argumentative and lengthy briefs instead of statements of the grounds on which petitioner relies together with facts sufficient to show the basis thereof. We agree with respondent that to be adequate *76 to shift the burden of proof petitioner's statement must set forth substantial, material, definite, and clear supporting facts. American Metal Products Corporation, 34 T.C. 89 (1960), affd 287 F. 2d 860 (C.A. 8, 1961). We find it unnecessary to determine the sufficiency or insufficiency of petitioner's 534(c) statement to shift the burden of proof to respondent in view of the record presented and the facts as we have found them. Although we are inclined to agree with respondent's arguments that petitioner's statements were inadequate and insufficient to shift the burden of proof to him, we have determined that we need not decide the burden of proof issue. Cf. I.A. Dress Co., 32 T.C. 93 (1959), affd. 273 F. 2d 543 (C.A. 2, 1960), certiorari denied 362 U.S. 976 (1960). We have concluded that even if the burden of proof with respect to whether earnings were accumulated beyond the reasonable needs of the business has been shifted to respondent, a preponderance of evidence before us clearly shows that the accumulations here involved were beyond the petitioner's reasonable business needs. Cf. James M. Pierce Corporation, 38 T.C. 643 (1962), *77 acq. 1963-1 C.B. 4, reversed and remanded on another issue, 326 F. 2d 67 (1964). We think that the record before us demonstrates clearly that petitioner's financial position at the end of and throughout each year in question was adequate to meet its present and anticipated business needs, that additional accumulations of earnings and profits were unreasonable and that petitioner was availed of for the proscribed purpose. We shall discuss the evidence in some detail later in our opinion. Once it is determined that petitioner here permitted unreasonable accumulations of earnings beyond business needs, the ultimate burden of proof with respect to whether it was availed of for the proscribed statutory purpose rests upon petitioner. Pelton Steel Casting Co., 28 T.C. 153 (1957), affd. 251 F. 2d 278 (C.A. 7, 1958), certiorari denied 356 U.S. 958 (1958). In the words of the statute itself, "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall *78 be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." Section 533(a). We hold that petitioner has not carried its burden of proof on this issue. The question of whether a corporation permitted its earnings and profits to accumulate beyond its reasonable needs, present and prospective, and whether it was availed of for the purpose of avoiding the income tax with respect to its shareholders are both questions of fact. Each case must rest on its own facts and circumstances, and this being so, we shall not attempt an analysis of the many decided cases in this area. Helvering v. National Grocery Co., 304 U.S. 282 (1938); World Publishing Co. v. United States, 169 F. 2d 186 (C.A. 10, 1948), certiorari denied 335 U.S. 911 (1949); Olin Corporation v. Commissioner, 128 F. 2d 185 (C.A. 7, 1942), affirming 42 B.T.A. 1203 (1940); James M. Pierce Corporation, supra.
*79 The reasonable needs of a corporation for adequate financial strength by accumulation of earnings must first be determined by its officers and directors and courts should be hesitant to substitute their judgment and attribute an ultimate tax avoidance motive unless the facts and circumstances of the case clearly warrant the conclusion that the accumulations were unreasonable and for the proscribed purpose. James M. Pierce Corporation, supra; Breitfeller Sales, Inc., 28 T.C. 1164 (1957). In our analysis of the record before us, we must consider fully the reasonably anticipated needs of the business of petitioner in the light of the circumstances which faced it in the operation of its business in each of the years before us, considering not only its usual business operations but also various changes and diversifications in that business planned by petitioner's officers and directors. We must then inquire and determine whether the accumulated earnings and profits of prior years are in sufficient amount to cover all reasonable needs, and if so, did petitioner possess sufficient liquid assets at the end of each *80 year to meet its expected reasonable needs, and still permit additional dividend distributions to its shareholders. Gus Blass Co., 9 T.C. 15 (1947); Sauk Investment Co., 34 B.T.A. 732 (1936). The grounds relied upon by petitioner to show that the accumulation was not beyond the reasonable needs of its business can be broken down into several general categories: the absence of a history of the use of funds for purposes unrelated to the company's business operations; the need for funds to protect against potential business hazards; the need for funds for expected extraordinary expenditures for improvement and diversification of the business; and the need for funds to meet ordinary operating expenses and to provide for eventual replacement of fired assets. We shall examine petitioner's contentions in each of these categories. Petitioner points out that it did not engage in the practices of extending loans to its shareholders or making expenditures for their personal benefit. It also contends that it made no investments which were unrelated to its business operations. One of the principal indicators that earnings have been permitted to accumulate beyond *81 the reasonable needs of the business is a record of loans to shareholders or expenditures for their benefit, or of investments unrelated to the taxpayer's business. Sec. 1.537-(2)(c), Income Tax Regs., see Kerr-Cochran, Inc. v. Commissioner, 253 F. 2d 121 (C.A. 8, 1958), affirming a Memorandum Opinion of this Court. It is clear that funds so used are not necessary for the operation of the business when they are removed from access by the business and used by someone else. There is no evidence in the instant case of loans or expenditures for the personal benefit of the shareholders. [10] However, there was a substantial loan to Willows Realty in 1957, and, despite the contention of petitioner to the contrary, we have found as a fact that petitioner has, throughout the years in question, held investments in stocks and bonds which investments were essentially unrelated to its business activity. Of the securities listed in our Findings of Fact, only two were shown to have had a reasonable relationship to petitioner's business. Since Willows became a subsidiary of petitioner, the investment in Willows stock cannot be deemed entirely unrelated. We will discuss the Willows stock *82 acquisition and the 1957 Willows loan later in our opinion. The investment in Kayser-Roth Corporation stock was made during the course of business negotiations between that corporation and petitioner. Though the benefit to have been derived from this investment is not clear, the fact that it was liquidated after the negotiations broke off indicates that it was reasonably related to petitioner's business activity. We feel that we are giving petitioner the benefit of every doubt in concluding that the Willows and Kayser-Roth stocks were related to its business operation. It is contended that the investment in Colorado National Bank stock was also for a business purpose. Petitioner did all of its banking with Colorado National Bank. For this reason it desired to become an insider in the bank and it purchased stock in the bank allegedly to achieve this status. However, petitioner never owned more than 2 percent of the bank's stock. It did not get any representation on the board of directors. It is difficult to see, and petitioner has not shown, what advantages *83 could be had by petitioner's business through ownership of 2 percent of the stock in the bank with which it deals. No satisfactory relationship with the business of petitioner was established for any of the other investments. Hence, we must conclude that these investments were merely the putting to work of otherwise idle funds not needed in petitioner's business operation. See J. M. Perry & Co. v. Commissioner, 120 F. 2d 123 (C. A. 9, 1941), affirming a Memorandum Opinion of this Court. We must reach the same conclusion with respect to the $150,000 loan to Willows in 1957. Under all of the circumstances, Income Tax Regs. 1.537-2(c)(3) requires the conclusion that this loan, in effect a loan to petitioner's stockholders, indicates an unreasonable accumulation by petitioner in 1957. [11]
*84 Petitioner has placed great emphasis on the several business hazards and contingencies which it purportedly faced during the years in question, alleging the possibility of adverse changes in circumstances as justification for accumulation of earnings. To begin with, petitioner claims to have been in a state of constant fear that in any year there might be such an increase in mortality of FPEA members that the claims arising therefrom would wipe out all of its net income. This fear was groundless, if not imaginary. It is to be noted that the minutes of the corporate meetings [12] contain not the slightest hint of any fear that this adverse circumstance could occur. The entire history of petitioner's business shows that variations in mortality claims as a percent of insurance in force are not very great. Petitioner's principal witness, vice president T. L. Howard, admitted on cross-examination that it would take a 50 percent increase in mortality to wipe out petitioner's mortality refund. Other evidence showed that the possibility of petitioner's net income being entirely wiped out through increased mortality is statistically so remote as to render unreasonable any fears that it would *85 be likely to happen. The retention of earnings as protection against an adverse business contingency is clearly a reasonable need of the business. See William C. Atwater & Co., Inc., 10 T.C. 218 (1948), acq. 1948-1 C.B. 1. However, when the alleged contingency is as remote and as unlikely of occurrence as it was in the instant case, accumulation of earnings to meet such a remote contingency cannot be deemed for the reasonable needs of the business. Accord, J. Gordon Turnbull, Inc., 41 T.C. 358 (1963), (on appeal, C.A. 6, Sept. 16, 1964).
Another alleged hazard was the so-called "unilateral right" of the insurance carrier, General American Life, to lower the rate charged to FPEA members. Any lowering of this rate without a corresponding increase in FPEA membership would reduce petitioner's gross income. However, fear of this occurrence was largely unwarranted for several reasons. Throughout the 42-year history of the FPEA through *86 1959 there was never a lowering of rates by General American to FPEA members. Such a history makes one wonder why after all those years there should be a fear that something which has never happened before is so likely to happen that earnings should be retained to meet the possibility. Furthermore, petitioner has not established that such a lowering of rates, if it should occur, would produce less income to petitioner. With lower rates to offer petitioner should be able to attract enough new members to the group to make up for the diminished premiums from the old members. In fact, one would expect petitioner to welcome such a change since the continued success of the group depends upon the joining of new young members. Lower rates might well promote the interests of both the group and petitioner's treasury. Also, General American's profit is likewise based upon the premium rates since it retains 12 percent of the premiums. It is entirely reasonable to conclude that the interests of petitioner run in the same channel as those of General American, and, therefore, General American is not likely to take any action which will reduce petitioner's income since such action would bring a *87 similar reduction to General American's income. To justify its fears of a rate reduction, petitioner points out that a reduction actually was effected in 1962 and it in fact reduced petitioner's income significantly. However, it was brought out on cross-examination that the 1962 changes were not a general rate reduction but the institution of a new plan or a reorganization of the premium structure in the older age groups, designed not to reduce gross premiums but merely to shift them around. This change was not "unilaterally" imposed by General American, but adopted only after extensive negotiations with petitioner and FPEA. It is true that petitioner's income was reduced during the first year of the new plan. However, that year is not before us and certainly there is no evidence of any necessity to accumulate earnings in prior years to meet a vaguely anticipated result which did not occur until three to six years later. Petitioner claims that its business was endangered by possible adverse legislation, both Federal and state. The Federal legislation which was feared was never passed and in fact never was given serious consideration in Congress. Apparently it was a regulatory bill *88 which was a pet project of one representative who introduced it every year for several years. It was not shown by petitioner that any Federal legislation harmful to its business came anywhere near being enacted. Adverse regulatory activity by the states was a more realistic problem. Petitioner's activities were already limited in some states, and, apparently, regulation of operations like petitioner's were constantly being discussed in other states. Perhaps the hazard most feared by petitioner during the years in question was increased competition for members, particularly from newly organized Federal, state and local group insurance plans sponsored by the employer governments themselves. The evidence clearly showed a marked decrease in Federal employee membership in FPEA after the Federal Government adopted its own group plan in 1954. However, the evidence also shows that the fear of other competition from state and local government-sponsored groups was unwarranted. While Federal employees left FPEA in large numbers, other governmental employees must have joined in even larger numbers since the number of FPEA members grew from 74,165 in 1954 to 78,966 in 1959 and to 80,131 in 1960. *89 Also the amount of insurance in force increased every year from 1954 through 1961, inclusive. This indicates that petitioner was quite successful despite the loss of Federal employee members by FPEA. The fears of petitioner's officers which were aroused in 1954 became less and less justifiable every subsequent year in which insurance in force and gross income were increased. While the corporate minutes contain occasional references to the hazards of competition, there are also several reports of how successful the company had been, and the minutes are devoid of any concrete or definite plans or programs to be instituted to counteract these hazards. Petitioner has been successful in maintaining its gross income throughout the years in question and beyond. Gross income varied only slightly, upward and downward, from $1,511,000 in 1956 to $1,540,000 in 1962. Despite this and the increase in insurance in force, however, net income decreased through the 1956-1959 period. This was largely because expenses, except taxes, increased rather steadily from $879,000 in 1956 to $1,090,000 in 1962, but part of this expense increase was because of larger salaries and bonuses to the Howards; from *90 $81,000 in 1953 to a high of $112,000 in 1957. However, petitioner's basic contention that its business was going downhill during this period is not without some basis in fact. Furthermore, while the anxiety generated by the legislative claimate in the states and by increased competition is perhaps somewhat exaggerated by petitioner, it was not wholly groundless, and all things considered petitioner may well have determined that it should exercise financial caution. However that may have been, we cannot conclude that its extreme caution was justified in the light of the record before us. Business contingencies and the possibility of adverse occurrences have clearly been recognized as reasonable grounds for accumulation of earnings. See William C. Atwater & Co., Inc., supra; L. R. Teeple Co., 47 B.T.A. 270 (1942); Mertens, Law of Federal Income Taxation (1956 ed.), sec. 39.44, et seq. However, the law is equally clear that the mere existence of a contingency is not enough. As already indicated, there must be some reasonable possibility of the contingency occurring. *91 J. Gordon Turnbull, Inc., supra.In addition, it is not sufficient merely to accumulate funds and sit idly by waiting for the contingency to occur, if it ever does. There must be "specific, definite and feasible plans for the use of such accumulation." Sec. 1.537-1(b)(1), Income Tax Regs. The cases have held repeatedly, and the above-quoted regulation requires, that the corporation alleging as a reasonable need of the business the need for funds for future use (such as expansion or protection against contingencies) must have a definite and specific plan for this use. I.A. Dress Co. v. Commissioner, 273 F. 2d 543 (C.A. 2, 1960), affirming 32 T.C. 93 (1959), certiorari denied, 362 U.S. 976; Motor Fuel Carriers, Inc. v. United States, 322 F. 2d 576 (C.A. 5, 1963); Barrow Mfg. Co., Inc. v. Commissioner, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court, certiorari denied, 369 U.S. 817. The usual approach taken by a corporation which is in a downhill slide and which is beset with new business hazards of a permanent nature, as petitioner *92 claims to have been, is to make new plans for sales expansion or cost cutting, or plans for diversification of the corporation into other lines of business, and to accumulate earnings, if necessary, to carry out these plans once they are definite. This is what petitioner alleges it has done. It has offered extensive evidence to show its various "plans" for improvements and diversification. We have examined all of the proposals which petitioner claims to have considered. The material facts surrounding most of them have been found, supra, and we need not repeat them here. Certain other diversification ideas were testified to which do not require detailed findings of fact. Suffice it to say that such alleged "plans" as have not been made the subject of specific findings of fact (such as the "plan" to publish a periodical weather newsletter, which appears to have been nothing more than "backyard" discussions between vice president T. L. Howard and his neighbor, a weather expert) were so nebulous as to have no importance in our analysis - except perhaps to indicate the general weakness in the case of a petitioner who leans on such slender reeds. While at first blush it might appear that *93 petitioner's investment in Willows might be regarded as justification for the accumulation and use of earnings either on the ground that it was the acquisition of a new line of business or that it was in effect the purchase of real estate used by petitioner in its business, we have concluded that we need not decide this issue. Willows was not engaged in business but rather was a holding or investment company as our Findings of Fact indicate. Cf. sec. 1.533-1(c), Income Tax Regs. Respondent argues that Willows' business was not the business of petitioner even after petitioner acquired control by buying in excess of 80 percent of its stock, because Willows was not actually engaged in the conduct of a business, citing section 1.537-3(b), Income Tax Regs. We must concur and conclude that the business of Willows was not the business of petitioner. In addition, petitioner has not shown any need of Willows for which an accumulation of earnings by petitioner was justified in the years before us even if we were constrained to conclude that the business of Willows became the business of petitioner in 1958. We have eliminated the petitioner's *94 investment in Willows from net current assets because of our finding that its stock was not a liquid investment. Thus, petitioner's investment in Willows has not been considered by us as a part of net liquid assets available to petitioner in our conclusions that earnings have been accumulated beyond the reasonable needs of petitioner's business in each of the years before us. Petitioner having shown no planned and definite requirement of Willows for which it needed to add to its accumulation of earnings, we could not in any event permit an accumulation by petitioner for Willows' business purposes. We will discuss petitioner's argument that it should be allowed to accumulate earnings to fund depreciation of Willows' assets later in our opinion. Of all the plans and ideas testified to, we have found only one which had sufficient substance and definiteness to justify an accumulation of earnings in the years before us. In 1957 petitioner entered a contract for the purchase of a list of names of prospective new FPEA members. Payment was to be made based on the number of names actually supplied. Although the total names supplied under the contract eventually cost only approximately $35,000, *95 the testimony and the corporate minutes indicate that as of December 31, 1957, petitioner anticipated that the list contract would produce a quantity of names costing roughly $180,000. Hence, the accumulation of earnings in 1957 was reasonable to the extent needed to meet the planned extraordinary expense. Whether or not there were sufficient net liquid assets from previous accumulations as of December 31, 1957, to meet the extraordinary expense is discussed, infra. Two other ideas were actually carried out, but neither of them justified accumulation of earnings at the end of any of the years in question. In 1956 petitioner carried out a test mailing to promote a program of investment by mail. The results were disappointing and the investment by mail plan was abandoned in 1956. Thus, while this was an idea actually put into effect it was not a plan which justified accumulation of earnings at the end of 1956 since it was abandoned prior to the end of that year. An educational film on the Civil Service was produced by petitioner in 1958. While the December 1957 corporate minutes indicate that this film was being considered, there is no evidence of a production contract or even a cost *96 estimate as of that time. After production of the film in 1958 there were no discussions about any other films until 1961. Thus, the production of the film, which eventually cost less than $40,000 and was apparently charged to ordinary operating expenses, did not justify accumulation of earnings in any of the years in question, and there is no evidence of a business need to accumulate earnings for other film productions in the years before us. It is our considered conclusion that none of the several other ideas testified to can be considered to have been specific, definite and feasible plans for the use of the funds accumulated during the period. The principal obstacle in petitioner's path in this case is the notable absence from the testimony and from both the financial statements and the corporate minutes of indications that petitioner's ideas for diversification were in such stages of planning as would justify accumulation of earnings. Further doubt that any serious plans existed at the end of the tax years in question is raised by the petitioner's use of language in its section 534(c) statement. Much of the statement is phrased in the present tense. For example: "The Corporation *97 definitely plans for * * *"; "It is the plan of this company to establish * * *." It is essential to note that such plans as the corporation has for use of accumulated earnings must be in existence at the close of the year in which the accumulation is made. "[The] controlling intention of the taxpayer is that which is manifested at the time of the accumulation, not subsequently declared intentions which are merely the products of afterthought." Smoot Sand & Gravel Corporation v. Commissioner, 241 F. 2d 197, 202 (C.A. 4, 1957), reversing and remanding a Memorandum Opinion of this Court on another issue, certiorari denied, 354 U.S. 922. It is not sufficient to accumulate without clear, specific, definite and feasible plans, and then later justify the earlier accumulation by creating such plans. Through the frequent use of the present tense in describing the corporation's alleged plans, petitioner leaves room for the inference that such plans did not exist during the years in question. Further indication that petitioner's case might contain elements of "afterthought" *98 appears in comparing petitioner's case at trial and in its brief with its contentions in the section 534(c) statement filed prior to trial. At trial petitioner attempted to show that it was considering the purchase or rental of new IBM equipment. Support for vague and general investigatory plans of this nature is found in general references in corporate minutes, however, no such plan was mentioned in the section 534(c) statement. One wonders how the corporation could have neglected to mention the IBM equipment in its 534(c) statement if indeed it had specific, definite and feasible plans for new equipment. Petitioner seems to have taken a "blunderbuss" approach to presenting its case. It is alleging as many needs of the business as it can show existed - regardless of the absence of specific plans to satisfy those needs. In concluding that petitioner had no definite plans during the years in question, we do not rely alone upon the shortcomings of the section 534(c) statement and the absence from the corporate records of evidence of concrete plans. The testimony at trial itself and certain statements which were made in the corporate minutes indicate the inchoate state of the several *99 ideas testified to. Most of the ideas petitioner considered were never carried out. This fact is additional evidence that there never was a real need to accumulate funds for their carrying out. See American Metal Products Corporation v. Commissioner, 287 F. 2d 860 (C.A. 8, 1961), affirming 34 T.C. 89 (1960). As for the few plans that were given more than just cursory consideration, there is a notable lack of evidence linking them directly with the accumulation of earnings in any of the years in question. There were no reserves set up on the books [13] for carrying out these plans, nor was there any mention in the corporate minutes of the need to withhold distribution of current earnings in order to effectuate such plans. It might be argued, though we have found no cases supporting such an argument, that a corporation which sees a financial storm on the horizon should be able to accumulate earnings merely to weather the storm, to provide a cushion against a foreseeable drain on earnings and/or capital without having to use the funds for diversification - a diversification which might not be needed when *100 the financial storm has passed. This might be an acceptable position, though we do not decide that question here. Here it is clear that petitioner's fears were not of a temporary storm, but of new hazards to the business which were of a permanent nature. In such a situation it does not suffice to accumulate earnings merely as a cushion. The only reasonable motive for accumulation when the new business hazards are permanent is to put the accumulated funds to work in some way to sidestep the hazards. And in order to justify an accumulation for this purpose there must be specific, definite and feasible plans for its use. It is likely that not all of the possible courses of action testified to by petitioner were "mere afterthoughts." In fact, the corporate minutes contain several mentions of the need for the corporation to diversify and for the officers to be alert for opporiunities to do so. However, considering all of the evidence, we have concluded that petitioner's plans were not sufficiently definite and feasible to meet the requirements of the regulations and the standards established in decided cases. Petitioner cites as further grounds relied upon for accumulation of earnings *101 its need for working capital to successfully carry out its regular operations. Respondent asserts that petitioner had available to it sufficient working capital at the end of each of the years in question to enable it to operate the following year without retention of the earnings of the current year. Both parties have presented figures to support their views on this matter. It is our opinion that respondent's calculations come closer to the proper analysis. The essential difference in the approaches is that respondent includes securities in working capital and petitioner does not. Petitioner argues that it is the usual accounting practice to include investments in current assets only if they are intended to be liquidated in the course of business in the near future. However, for purposes of determining actual availability of funds for use in the business, there is no sound reason not to count the value of liquid investments. As previously pointed out, most of the investments involved here were liquid and it was not essential to petitioner's business that they be retained. They were merely vehicles for placement of idle funds where they could earn money instead of lying fallow as cash. *102 The petitioner argues that the investments should not be included in working capital since they were not intended to be liquidated. We find this to be a vivid example of "bootstrap" argument. A substantial portion of petitioner's accumulated earnings has been invested in securities unrelated to its business needs. Petitioner then alleges that it is necessary to accumulate further earnings in order to pay expected operating expenses and that the funds invested cannot be regarded as available for operating expenses since there is no intention to liquidate the investments. Under this reasoning, no matter how great the accumulation over the years, as long as it is invested, even in securities unrelated to the taxpayer's business, further accumulation would be justifiable to meet operating expenses. Clearly this argument is invalid and we must reject it. Of the several past cases in which an analysis was made by comparing net liquid assets available with the anticipated need for liquid assets, we know of none in which unrelated liquid investments were excluded from the assets available. Although petitioner carried all of its investments on the balance sheet at cost, our findings of total *103 net liquid assets include the liquid investment at market value. Here again it is clear that, while cost may be a proper valuation for conservative accounting statement purposes, market value is a much more meaningful figure for purposes of our analysis. We are concerned with the total assets available as of a given time to meet business needs. Hence, the assets (including investments) must be valued at such amount as is most likely to be realized if they were to be converted into cash to meet business needs. The historical cost of the investments means very little in such an inquiry. While market value as of December 31 of any given year may not turn out to be the exact amount realized on the date on which the asset is turned into cash to meet business needs, it is clearly a closer estimate than historical cost. [14]
The working capital (including liquid investments) as of December 31 of each of the years in question is set forth *104 in column 2 of the table in our Findings of Fact, under the more descriptive title, "Net Liquid Assets Available to Meet Business Needs." Column 4 of the same table sets forth how much net liquid assets would have remained as of the same dates had petitioner distributed the retained earnings in each year which respondent asserts should have been distributed. It is petitioner's contention that to have distributed the earnings retained in each of these years would have left it with insufficient assets to meet operating expenses. In dealing with cases involving the accumulated earnings tax, we have at times applied a rule of thumb that an accumulation of earnings to meet operating expenses for at least one year is reasonable. F. E. Watkins Motor Co., 31 T.C. 288 (1958), acq. 1959-1 C.B. 5; see J. L. Goodman Furniture Co., 11 T.C. 530 (1948), acq. 1949-1 C.B. 2, James M. Pierce Corporation, supra.However, as was pointed out in Smoot Sand & Gravel Corporation v. Commissioner, supra, working capital needs of business vary *105 depending upon relevant factors applied to the particular business in question. The need of one business to accumulate sufficient earnings to meet one year's operating expenses may be reasonable whereas another business may not reasonably accumulate such an amount. In Dixie, Inc. v. Commissioner, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), certiorari denied 364 U.S. 827 (1960), the Court said (at page 528) in discussing this argument: The rule of thumb so stated may be one proper for administrative convenience but should rise to no higher level. The search must always be concerned with the needs of the particular business as they existed during the particular year. [Citations omitted.] This was approved in Barrow Mfg. Co., Inc. v. Commissioner, supra. While we have given the petitioner the benefit of a full year's operating expenses in our table in the Findings of Fact [15] (column 5), we feel very strongly that this is an inappropriate case for application of the one-year rule. Petitioner's operating expenses were relatively evenly spread over the year. The one-year rule allows the taxpayer to retain sufficient *106 funds to operate on full expenses for an entire year assuming not one cent of revenue during that year to help cover expenses. Here, however, petitioner's major source of revenue was its mortality refund, usually received in September. This mortality refund, which constituted 70 percent of its revenue, was always large enough to cover operating expenses from the time of its receipt until the end of the year. This mortality refund was never in danger of substantial reduction, and it in fact has increased fairly constantly throughout the petitioner's history. Thus, it is apparent that at the beginning of each year petitioner would need liquid assets to meet operating expenses for a maximum of only nine months, or through September, when the large mortality refund was received. Furthermore, the mortality refund was only 70 percent of petitioner's revenue. Most of the remaining 30 percent, including commissions and fiscal agent fees, could be expected to be received during the first nine months of the year, thus producing cash to pay expenses during the first nine months, and thereby reducing the total liquid *107 assets which had to be available at the outset of the year. Finally, petitioner's operations were such that its revenues could reasonably be expected to increase with its expenditures. The bulk of its business was from FPEA members who would renew their policies each year without expensive solicitation. Thus, petitioner had a fixed sales structure which was certain to produce revenue. Certain costs (billing, correspondence, etc.) were associated with these regular accounts, however, these costs, by definition, were associated with production of revenue. Hence, the allowance of an accumulation of funds for one year's expenses, assuming no revenue, is inappropriate here where a large portion of the expenses would not be incurred without production of revenue. Petitioner's major expense was solicitation of new customers (new FPEA members). This too is the kind of expense which would not be incurred unless productive of revenue. Hence, because petitioner's operation is such that its expenditures are certain to produce some revenue throughout the year, and because it is clear that at least the final three months' expenses will always be covered by revenue received (the mortality refund), *108 application of the one-year rule is not entirely appropriate in the instant case. However, for convenience and to afford every favorable inference to petitioner we have shown in our table an entire year's operating expenses. A comparison of column 4 with column 5 in the table reveals that even if petitioner had in each of the years in question distributed its retained net income, there would have remained enough net liquid assets to pay one year's cash operating expenses nearly one and one-half times over. As we have already indicated, a corporation may accumulate, in addition to funds for ordinary operating expenses, additional funds to cover extraordinary expenses which are definitely planned for or which may reasonably be expected to arise from contingencies. We have already concluded that the contingencies alleged by petitioner did not justify accumulation. We have also concluded that the only extraordinary expenditure for which there was a specific and definite plan at the end of one of the years in question was the $180,000 which the corporation, as of December 31, 1957, expected to spend for a prospect list in 1958. This expected extraordinary expense is reflected in column *109 6 of our table. It should be noted in the table that as of December 31, 1957, petitioner had sufficient net liquid assets to cover not only a whole year's ordinary operating expenses, but the $180,000 expected extraordinary expense as well, with several thousand dollars to spare. Petitioner claims that in addition to ordinary and extraordinary operating expenses, it may also accumulate earnings for the purpose of funding the accumulated depreciation on its real estate, i.e., to set aside assets equal to the depreciation taken on its real estate in order to have a fund for its replacement at the end of its useful life. It also claims that it may accumulate to fund the depreciation of Willows' real estate. We may easily dismiss as without merit this latter contention. In 1956 and 1957 petitioner had no equity interest in Willows. It is clear that a corporation may not justify an accumulation of earnings as being for the reasonable needs of another independent corporation, even though both have the same stockholders. Latchis Theatres of Keene, Inc., 19 T.C. 1054 (1953), affd. *110 214 F. 2d 834 (1954). Even though Willows was more than 80 percent owned by petitioner in 1958 and 1959, petitioner could not allege as a reasonable need of its business the funding of depreciation on its subsidiary's assets, since as we have already concluded, the business of Willows was not the business of petitioner. Sec. 1.537-3(b), Income Tax Regs.[16]
Petitioner claims that it should at least be deemed a reasonable need of its business to fund the depreciation on the flagstone office building which it owned at the end of 1956, 1957, and 1958. [17] To begin with, it must be pointed out that the question is moot at least as to the years 1956 and 1958. At the end of those years petitioner had enough liquid assets to permit distribution of retained earnings and still have enough to pay one year's operating expenses and to fund depreciation on its building as well. This *111 is not so as to 1957. We have already made it clear that it is inappropriate to allow an entire year's operating expenses in this case. Assuming petitioner needed fewer liquid assets for operating expenses at the end of 1957, it would then have had more available for funding depreciation and making the distribution of 1957 earnings to stockholders. However, we feel that no matter how much is needed for operating expenses, funding of depreciation on the facts of this case is not a reasonable need of the petitioner's business. Petitioner has cited cases which, without discussion of the question, seem to recognize the funding of depreciation as a reasonable need of a business for which earnings may be accumulated. There is no absence of contra authority, however, and we think the facts before us are different from the facts of those cases. Funding of depreciation amounts merely to the setting aside of funds to provide for a reasonably anticipated need of the business: the eventual replacement of the assets being depreciated. Section *112 537 regards reasonably anticipated needs as "reasonable needs of the business." However, section 1.537-1(b)(1), Income Tax Regs. provides: In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Applying this rule, accumulation for replacement of a corporation's office building, even if accomplished through a so-called funding of depreciation, would not be a reasonable business need where, as in the instant case, there are no immediate plans for purchase or construction of a new building, and the useful life of the building being depreciated should not reasonably be expected to expire until some time in the very distant future. We have already cited several cases in which taxpayers' attempts to justify accumulations as being necessary for future expansion or acquisition of fixed assets were rejected for *113 lack of specific, definite and feasible plans. See, e.g., Barrow Mfg. Co., Inc. v. Commissioner, supra.[18] Would the result have been any different in any of these cases if the corporate taxpayers had chosen to account for their accumulations by labeling them "funded depreciation" on old assets rather than "fund to purchase new assets"? We do not believe that mere labeling should produce a different result. While none of the cases cited by petitioner directly discuss the properiety of allowing funding of depreciation as a reasonable business need, the case of World Publishing Co. v. United States, 72 F. Supp. 886 (D.C.N.D. Okla., 1947), affd. 169 F. 2d 186 (C.A. 10, 1948), certiorari denied 335 U.S. 911, in finding it improper contains the *114 following reasoned discussion (at p. 891): The construction of taxpayer's books as well as general accounting practice in relation to such a reserve [for depreciation] set it up as a charge against the assets depreciated. It is clearly treated as a valuation reserve. Were it a replacement or funded reserve, as taxpayer apparently seeks to treat it now, the books and balance sheet of the [corporation] should so indicate. Moreover, it would be unusual for a business of this kind to maintain a funded reserve for depreciation. The depreciation is slow and regular; the assets, its building and press equipment, are not subject to frequent replacement from rapid deterioration or obsolescence. Much of this quotation is applicable to the instant case, in which there appears to be good reason to doubt that the practice of funding depreciation was ever really adopted. The corporate minutes contain nothing about funding depreciation. Doubt is cast upon the testimony of petitioner's independent accountant to the effect that petitioner actually followed the practice by his admission that his recommendations that it be followed were made only in informal discussions with petitioner's officers, *115 and by the absence of any reflection in the financial statements that the practice was being followed. Usually when the practice of funding depreciation is adopted a reserve is set up in the retained earnings account showing the "fund" set aside for replacement of fixed assets. It would also be appropriate to show the particular assets earmarked for such a fund on the asset side of the balance sheet. There is no indication anywhere on petitioner's financial statements that the corporation has actually adopted the practice of funding its accumulated depreciation. Even if it were clear that accumulation for replacement of assets in the distant future is a reasonable need of the business and that petitioner actually followed that practice during the years in question, two assumptions which we do not accept as correct, it would not always be proper to permit an accumulation in the full amount of the reserve for depreciation account. If depreciation is taken on an accelerated method or is based upon an unreasonably short useful life then the accumulated depreciation would be quite large in the early years. Retention of earnings in the amount of such an "inflated" accumulated depreciation *116 in the early years is excessive and beyond the reasonable needs of the business during those early years, especially since the expected use of the funds for replacement is far in the future. Furthermore, the funding would be excessive and beyond reasonable business needs to the extent that it applies to assets which will not need replacement. In the instant case both of these elements are present. Petitioner had, since the construction of its building in 1951, depreciated it based upon a 20-year life. After Willows acquired the building at the end of 1959 it adopted a 40-year life, thus tending to show that depreciation taken by petitioner was greatly accelerated, and if funded, would have resulted in an annual accumulation large enough to permit replacement in 20 years, when replacement would more likely not have been needed for 40 years, i.e., an accumulation beyond reasonable needs. Furthermore, the evidence discloses that a portion of petitioner's building was leased to an unrelated tenant. Hence, it is apparent that to carry on its business efficiently petitioner would not need a building as large as the one it occupied and depreciated during the years in question. At the expiration *117 of the life of petitioner's building, its replacement need not be as large as the one replaced. Thus, it would be beyond the reasonable needs of the business to fund the total depreciation on a building which is larger than needed to house petitioner's operations. To permit the accumulation of earnings in the amount of the reserve for depreciation on the facts of this case would likely produce a situation in which in all future cases of this nature the taxpayer will assert that it must be permitted to retain assets at least equivalent to its depreciation reserve, no matter how inflated that reserve is, no matter how great the need or how definite the plans to replace the depreciating assets. A taxpayer against which the accumulated earnings tax is assessed which happens to have a large reserve for depreciation but does not fund this reserve in its accounting statements and which has no plans for use of its liquid assets will merely point to its reserve for depreciation and allege that the accumulation cannot be deemed unreasonable unless there are liquid assets in excess of the reserve for depreciation. Such a result is not contemplated by the Code or the Regulations, and we do not *118 understand the decided cases to dictate it, but rather as we read them the cases require the contrary conclusion which we reach here. Our finding that petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business is determinative of the ultimate issue that petitioner was availed of for the purpose of avoiding taxes on its shareholders unless petitioner has shown to the contrary by a preponderance of the evidence. See section 533(a). Petitioner quite rightly lays great emphasis on the fact that it has had an excellent record of dividend payment and has paid substantial salaries over the years. These are strong factors which tend to indicate that the proscribed purpose was not present in its accumulation. Sec. 1.533-1(a)(2)(iii), Income Tax Regs.; see James M. Pierce Corporation, supra; Gazette Publishing Co. v. Self, 103 F. Supp. 779 (D.C.E.D. Ark., 1952). However, such evidence is not conclusive. No matter how good a corporation's dividend record is over the years, the amount accumulated *119 and remaining in liquid form (or invested in unrelated securities) may have reached such proportions that no more accumulation is reasonably needed by the business. We have concluded that this is the situation in this case. In discussing the correct principles of law to be applied in these cases, the court in World Publishing Co. v. United States, supra, quoted the trial court and said (at page 187): The touchstone of liability * * * is the purpose behind the accumulation of the income and not the consequence of the accumulation. Here petitioner had an accumulation of earnings and profits exceeding $1,500,000 at the end of 1956, $1,700,000 at the end of 1957, $1,800,000 at the end of 1958, and $1,900,000 at the end of 1959. The distribution of dividends in substantial amounts in each of those years does not establish that the large amounts retained were not so retained to avoid the shareholder surtax. Even giving substantial weight to a favorable dividend record, we know of no case in which this factor alone has resulted in a decision for the taxpayer. To the contrary there are at least two cases in which corporations with favorable dividend records were held subject to the tax. *120 See Trico Products Corporation v. McGowan, 169 F. 2d 343 (C.A. 2, 1948), certiorari denied 335 U.S. 899, J. Gordon Turnbull, Inc., supra.
We have already concluded that petitioner allowed its earnings and profits to accumulate beyond the reasonable needs of its business. The presumption which arises from this finding was not present in any of the cases in which a favorable dividend record helped produce a decision for the taxpayer. Petitioner has produced substantial evidence in rebuttal. It has shown a very respectable history of dividends and salaries paid; it has shown the absence of repeated loans to shareholders or expenditures by the corporation for their personal benefit, and it has presented the testimony of its principal officer and (with his wife) major shareholder that no actions were ever taken with the purpose of avoiding tax on shareholders. However, in addition to the presumption in respondent's favor there is other evidence of petitioner's purpose to avoid the surtax on its stockholders. The investment in and retention by petitioner of securities essentially unrelated to its business is evidence of the proscribed purpose. *121 Sec. 1.533-1(a)(2)(ii), Income Tax Regs. So also is the large loan to Willows made by petitioner in 1957 when Virginia Howard owned 80 percent of Willows stock. Sec. 1.533-1(a)(2)(i), Income Tax Regs.; cf. KOMA, Inc. v. Commissioner, 189 F. 2d 390 (C.A. 10, 1951), affirming a Memorandum Opinion of this Court. Some weight must also be given to the fact that if the petitioner had paid out its additional earnings, the two principal and controlling shareholders, T.L. and Virginia Howard, would have been subject to a very large additional personal income tax. While this last-mentioned factor is not determinative of the intention to avoid taxes, it is entitled to some weight. See American Metal Products Corporation v. Commissioner, supra; J. A. Dress Co., supra. Considering the presumption created by our finding that earnings and profits were allowed to accumulate beyond the reasonable needs of the business, together with the other evidence on the ultimate question of tax-avoidance motive introduced by both parties, we have concluded that for each of the years 1956 through 1959, inclusive, the petitioner *122 has failed to carry its burden of proof and that it was availed of for the purpose of avoiding the income tax with respect to its shareholders. Therefore, the deficiencies asserted by respondent as a result of his imposition of the accumulated earnings tax under section 531 are sustained. Decision will be entered for the respondent. Footnotes
1. All references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.↩
2. Virginia Howard also held a few shares as trustee for Mullin and Weller, her cousins.↩
3. Current assets in excess of current liabilities. Included in current liabilities and responsible for the major part thereof are accrued income taxes.↩
4. The investment in Kayser-Roth Corporation stock was held during the period in which petitioner was negotiating with Kayser-Roth regarding a proposed business venture between the two, which is discussed, infra.↩
5. Taking liquid investments at market. The propriety of using market value rather than the lower cost value is discussed, infra.↩
6. We have calculated these totals by taking the total expense deductions shown on petitioner's tax returns and deducting therefrom: ↩
(a) Depreciation
This is a non-cash expense; no liquid funds are
needed.
(b) Rent
This was merely a bookkeeping debit offset by
another book entry crediting fictitious rent
income in the same amount and not represented by
any actual expenditure.
(c) Executive bo-
These are not ordinary op
nuses, state
erating expenses for which
income taxes
cash must be provided in
and contribu-
advance; they will only be
tions
incurred if there is sufficient cash derived from
profitable operations to
warant them.
7. Hereinafter referred to as "Willows." This property was then owned by Virginia Howard but was subsequently transferred to Willows and leased by petitioner from it.↩
8. Included in this transaction also was a note from Willows to petitioner paid off in stock rather than by cash, but this note does not appear to be the note due July 1, 1960, reference to which is made, supra. ↩
9. Of the $504,280 total for 1959, $38,045 was attributable to the building and improvements acquired from petitioner December 31, 1959.↩
1. Liquid investments included at market values, which were higher than cost, as indicated in our findings. ↩
2. Used as estimate of ordinary cash operating expenses for following year. See footnote 6 for method of calculation.↩
10. There is some evidence of temporary advances to officer-stockholders which we do not deem of material or significant nature.↩
11. Sec. 1.537-2(c)(3) Unreasonable accumulations of earnings and profits. Although the following purposes are not exclusive, accumulations of earnings and profits to meet any one of such objectives may indicate that the earnings and profits of a corporation are being accumulated beyond the reasonable needs of the business: (3) Loans to another corporation, the business of which is not that of the taxpayer corporation, if the capital stock of such other corporation is owned, directly or indirectly, by the shareholder or shareholders of the taxpayer corporation and such shareholder or shareholders are in control of both corporations.↩
12. References herein to minutes of corporate meetings refer to both stockholders meetings and directors meetings.↩
13. As reflected in the financial statements.↩
14. For example, the cost of petitioner's stock of Colorado National Bank, acquired years ago, was $51,000 but the market value of this stock at the end of each year here involved varied between $179,000 and $245,000, from three to four times as much.↩
15. Hereinafter sometimes referred to as "the table" or "our table."↩
16. Also, as our further discussion of the funding of depreciation issue will indicate, no plans therefor were made; it was an afterthought and petitioner has not shown it was a reasonable business need for which earnings should be accumulated in the years before us.↩
17. The building was owned by Willows at the end of 1959, at which time petitioner had no major fixed assets which required a depreciation fund.↩
18. See also Smoot Sand & Gravel Corporation v. Commissioner, 241 F. 2d 197 (C.A. 5, 1957) reversing a Memorandum Opinion of this Court on another issue and Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 363 U.S. 832↩, on which petitioner relies.