T.C. Summary Opinion 2018-38

UNITED STATES TAX COURT

JOHN A. GARCIA AND JAMIE GARCIA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 498-17S.                    Filed August 7, 2018.

<u>Solis Cooperson</u>, for petitioners.

<u>Sheri A. Wight</u>, for respondent.

SUMMARY OPINION

THORNTON, <u>Judge</u>: This case was heard pursuant to the provisions of

section 7463 of the Internal Revenue Code in effect when the petition was filed.[1]

_____

[1]Unless otherwise indicated all section references are to the Internal
Revenue Code in effect for the year at issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure. Monetary amounts are rounded to the

(continued...)

Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a $27,017 deficiency and a $5,403 accuracy-related penalty with respect to petitioners' 2012 Federal income tax. The issues for decision are: (1) whether legal and professional fees paid in 2012 are properly deductible as ordinary and necessary business expenses of petitioners' wholly owned S corporation and (2) whether petitioners are liable for the accuracy-related penalty pursuant to section 6662(a).[2]

## Background

The parties have stipulated some facts, which we incorporate by this reference. When they petitioned the Court, petitioners resided in California.

Shareholder Litigation

In 2005 petitioners purchased 498,900 shares of stock in Randgold & Exploration Co., Ltd. (R&E), a South African exploration and gold mining investment company. At all relevant times petitioners have been the registered owners of the R&E shares.

---

[1](...continued)
nearest dollar.

[2]The parties filed a stipulation of settled issues resolving all other issues.

At some point R&E shareholders discovered that Investec Bank, Ltd. (Investec), an international specialist bank, had engaged in a fraudulent scheme involving R&E stock, which ultimately devalued R&E shares. Sometime before 2012 a consortium of minority shareholders (consortium) instituted litigation in a South African court against R&E and Investec for corporate fraud (litigation).[3] The purpose of the litigation was to secure judgment in favor of the R&E minority shareholders and recover their investments.

In return for a promised percentage of any ultimate recovery, petitioners agreed to finance a portion of the consortium's legal and related expenses. During 2012 their commitment totaled at least 500,000 rand.[4] During 2012 the consortium made "capital calls", whereby it invoiced petitioners and other consortium members for their agreed-upon contributions to fund the litigation. In response to these capital calls, on February 1, 2012, petitioners wired $39,609 from their personal brokerage account with Fidelity Investments (Fidelity account)

---

[3]A group of shareholders that included Mr. Garcia commenced the R&E litigation as early as 2005, and a second group was formed shortly thereafter to represent a broader group of shareholders. On March 28, 2011, "the applicants" (ostensibly including petitioners) instituted legal proceedings in a South African court, seeking an order to require Investec to purchase the applicants' R&E shares for a certain price.

[4]In subsequent years petitioners' commitment increased to at least 850,000 rand.

to Anglorand Securities, Ltd. (Anglorand), another plaintiff in the litigation. At the then-current exchange rate, this payment satisfied 300,000 of their total 500,000 rand commitment to the consortium. The remaining 200,000 rand of the commitment was satisfied by two subsequent, roughly equal payments of U.S. dollars, viz, on June 13, 2012, petitioners wired $12,321 from their Fidelity account to Anglorand, and on December 20, 2012, JGx5 Enterprises (JGx5), petitioners' wholly owned subchapter S corporation, wired $12,250 from its corporate bank account to Anglorand.

At some unspecified time Mr. Garcia entered into a written agreement with Mankadan Investments (identified in the record as one of the "workers" in the consortium) to provide professional services to the consortium in return for an extra percentage of any recovery.

Creation of Subchapter S Corporation, JGx5

On February 9, 2012, JGx5 was incorporated in the State of California with Mr. Garcia as the sole shareholder. During 2012 JGx5 owned four rental properties described as single-family residences. During 2012 three of these properties were rented and the fourth was in the process of being rehabbed or refurbished. The four rental properties were in southern California. During 2012

JGx5 managed these properties but did not otherwise engage in property management services to third parties.

On February 28, 2012, petitioners signed two documents, each captioned "SPECIAL MINUTES OF JGX5 ENTERPRISES".[5] One of these documents states in part:

> A) money transfers into JGx5 Enterprises from John & Jamie Garcia will be deemed loans to the Corporation[,] B) costs incurred by John & Jamie Garcia associated with the assignment of assets or otherwise transferred to JGx5 Enterprises shall be treated as a loan to JGx5 Enterprises whereas such costs shall not be in excess of such costs incurred up until the time of the transfer, C) money transfers out of JGx5 Enterprises to John & Jamie Garcia will be deemed repayment of loans or in the event such loans have been repaid such money transfers out of JGx5 enterprises will be considered a [sic] income distribution or otherwise * * *.

This document states that any loans are noninterest bearing and are for a term of the "greater of 20 years or Perpetual Term".

The other document, captioned "Special Minutes", states that petitioners "assign their litigation rights for any investment made by John and Jamie Garcia to JGX5 Enterprises." It also states that "the business of JGX5 is to make investments, including the funding of litigation costs * * * [i]n exchange for * * *

---

[5]Although the parties have stipulated that Mr. Garcia was the sole shareholder of JGx5 during 2012, Mrs. Garcia signed each of these documents as "Shareholder".

a[n] ownership interest in the litigation recovery, if any." The document further states that "this memo is to provide further clarity that Randgold & Exploration litigation funding is being done through JGX5 Enterprises and that JGX5 Enterprises will earn a fair return on its investment for funding such litigation." The document states: "RESOLVED, that JGX5 accepts litigation and the costs thereof in return for a reasonable assignment of shares necessary to cover the costs of litigation and provide for a reasonable recovery."

None of the R&E stock was ever actually assigned to JGx5 and, as previously stated, petitioners remained the registered owners of the R&E stock at all relevant times. JGx5 never submitted an application to intervene in the R&E litigation, and none of the legal documents relating to the R&E litigation refers to JGx5.

Tax Returns

On its 2012 Form 1120S, U.S. Income Tax Return for an S Corporation, JGx5 listed its business activity code as 531110, which corresponds to "Lessors of Residential Buildings & Dwellings (including equity REITs)". On the 2012 Form 1120S JGx5 claimed a deduction for legal and professional fees of $76,630 and reported an ordinary business loss of $133,952.

On their 2012 Form 1040, U.S. Individual Income Tax Return, petitioners reported wages of $429,222 earned by Mr. Garcia from his employment as a financial analyst for ADP Totalsource and claimed a $138,067 loss on Schedule E, Supplemental Income and Loss. The Schedule E loss included the $133,952 ordinary business loss reported by JGx5. Petitioners' 2012 Form 1040 reported total tax of $100,661.

By notice of deficiency respondent disallowed $72,780 of the legal and professional fees deduction claimed by JGx5.[6] Respondent also determined that petitioners were liable for the section 6662(a) accuracy-related penalty.

## Discussion

### I. Deductibility of Legal Expenses

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are allowed as a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any claimed deduction. Rule 142(a);

---

[6]Respondent determined in the notice of deficiency that petitioners were allowed to deduct $64,180 of these expenses as a miscellaneous itemized deduction.

INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

The primary issue is whether petitioners are entitled to a pass-through deduction for certain legal and professional fees that JGx5 claimed on its corporate income tax return.[7] Petitioners claim that $64,180 of these fees is deductible under section 162(a) as ordinary and necessary business expenses of JGx5.[8] Respondent contends that these fees are not deductible under section 162(a) but concedes, as determined in the notice of deficiency, that they are properly deductible by petitioners under section 212, as nonbusiness income-producing expenses. The distinction matters inasmuch as a deduction under

---

[7]An eligible small business corporation that elects S corporation status is generally exempt from corporate income tax. See sec. 1363(a). Instead, the S corporation's shareholders must report pro rata shares of the S corporation's taxable income, losses, deductions, and credits. Sec. 1366(a)(1)(A); sec. 1.1366-1(a), Income Tax Regs. An S corporation item generally retains its character for the shareholder. Sec. 1366(b). An S corporation's taxable income is generally computed in the same manner as an individual's. Sec. 1363(b).

[8]Petitioners have raised no argument and adduced no evidence to support any deduction for $8,600 of the total $72,780 of legal and professional fees that respondent disallowed in the notice of deficiency. We deem petitioners to have waived or conceded any issue as to $8,600 of the disallowed deduction.

section 212 may be less beneficial to petitioners than a deduction under section 162(a).[9]

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Petitioners have not shown that either the first payment of $39,609, on February 1, 2012, or the second payment of $12,321, on June 13, 2012, represented expenses "paid or incurred" by JGx5 so as to support a deduction under section 162(a).[10] Petitioners wired both of these payments to Anglorand from their personal account, in partial satisfaction of their personal commitment to contribute at least 500,000 rand of the consortium's legal expenses.

We assign little significance to the "Special Minutes" that petitioners signed in 2012, purportedly assigning the litigation and costs to JGx5. Transfers between a corporation and its sole shareholders are subject to heightened scrutiny, and the

---

[9]As miscellaneous itemized deductions, sec. 212 deductions, unlike sec. 162(a) deductions, are generally deductible only to the extent they exceed 2% of an individual's adjusted gross income, see sec. 67, and may also be limited by application of the alternative minimum tax, see sec. 56(b).

[10]The taxable year for which business expenses may be deducted depends upon whether the taxpayer uses the cash basis or accrual basis method of accounting. See sec. 7701(a)(25) ("The terms 'paid or incurred' and 'paid or accrued' shall be construed according to the method of accounting upon the basis of which taxable income is computed[.]"). The record does not reflect whether JGx5 was a cash basis or accrual basis taxpayer.

labels attached to such transfers mean little if not supported by other objective evidence.  E.g., Boatner v. Commissioner, T.C. Memo. 1997-379, aff'd without published opinion, 164 F.3d 629 (9th Cir. 1998).  The record contains no objective evidence to suggest that this paperwork altered in any way petitioners' relationship to the consortium or their personal obligation to the consortium for the legal expenses in question.  Indeed, all the evidence shows that the consortium continued to invoice petitioners, and not JGx5, for payment of petitioners' commitment even after the year at issue.  JGx5 never submitted an application to intervene in the R&E litigation, and none of the legal documents relating to the R&E litigation refers to JGx5.

We are similarly unimpressed by petitioners' assertion that their February 1 and June 13, 2012, payments to Anglorand represented "loans" to JGx5 pursuant to the "Special Minutes".  Neither payment could fairly be characterized as a "transfer into" JGx5 under the terms of the "Special Minutes", and there is no objective evidence of a bona fide expectation of repayment.  In any event, the February 1, 2012, payment was made nine days before JGx5 was even incorporated.

Unlike the other two payments, the $12,250 payment on December 20, 2012, was in fact made by JGx5.  Respondent has not argued that this payment

was not "paid or incurred" by JGx5 within the meaning of section 162(a). As explained below, however, this payment is also nondeductible by JGx5 because petitioners have failed to show that it was an ordinary and necessary business expense of JGx5.[11]

For the reasons just discussed, the legal and professional fees at issue were the expenses of petitioners rather than of JGx5. A taxpayer generally may not deduct the payment of another person's expense. See Deputy v. du Pont, 308 U.S. 488, 494-495 (1940); Betson v. Commissioner, 802 F.2d 365, 368 (9th Cir. 1986), aff'g in part, rev'g in part, T.C. Memo. 1984-264; Hood v. Commissioner, 115 T.C. 172, 179-181 (2000); J. Gordon Turnbull, Inc. v. Commissioner, 41 T.C. 358, 378 (1963) ("Legal fees paid on behalf of, and for services rendered to, another are generally not deductible as ordinary and necessary business expenses of the payer."), aff'd, 373 F.2d 87 (5th Cir. 1967). An exception to this general rule may apply if a taxpayer pays someone else's expenses to protect or promote his own separate trade or business. See, e.g., Gould v. Commissioner, 64 T.C. 132, 134-135 (1975); Lohrke v. Commissioner, 48 T.C. 679 (1967). This exception

---

[11]Respondent has not raised, and accordingly we do not consider, any issue as to whether this amount should be considered a constructive dividend from JGx5 to petitioners. Cf. Hood v. Commissioner, 115 T.C. 172, 179-182 (2000) (holding that legal fees a corporation paid for the primary benefit of its sole shareholder constituted nondeductible constructive dividends).

typically applies only where the taxpayer pays the obligations of another person or entity in financial difficulty and where the obligor's inability to meet his obligations threatens the taxpayer's own business with direct and proximate adverse consequences. Hood v. Commissioner, 115 T.C. at 180-181; see also Square D Co. v. Commissioner, 121 T.C. 168, 200 (2003).

"[T]he showing a corporation must make to deduct the expenses of its shareholder is a strong one." Hood v. Commissioner, 115 T.C. at 181. The test is sometimes expressed as having two prongs: (1) the taxpayer's primary motive for paying the expenses must be to protect or promote the taxpayer's business and (2) the expenditures must constitute ordinary and necessary business expenses for the furtherance or promotion of the taxpayer's business. Lohrke v. Commissioner, 48 T.C. at 688; see also Capital Video Corp. v. Commissioner, 311 F.3d 458, 464 (1st Cir. 2002), aff'g T.C. Memo. 2002-40; Menard, Inc. v. Commissioner, T.C. Memo. 2004-207, rev'd on other grounds, 560 F.3d 620 (7th Cir. 2009).

Petitioners do not meet either prong of this test. As to the first prong, petitioners have not shown that the expenses in question were incurred primarily for the benefit of JGx5 and that any benefit to petitioners was only incidental. See Capital Video Corp. v. Commissioner, 311 F.3d at 464. The benefits to petitioners are obvious: The costs were incurred to recover their investments in R&E. And

as they acknowledge on brief, treating the payments as business deductions of JGx5 rather than as section 212 expenses of petitioners would result in more favorable tax treatment for petitioners. The business justification for JGx5 to pay these expenses is not at all obvious. There is no suggestion, for instance, that any payment of the expenses by JGx5 would have been motivated by any genuine consideration to avoid adverse business consequences as might result if petitioners were unable to meet their financial obligations. The record does not suggest that petitioners were experiencing any financial difficulty in 2012. To the contrary, in 2012 Mr. Garcia reported over $400,000 of wage income.

As to the second prong, petitioners have not shown that the legal expenses in question represent ordinary and necessary business expenses in the furtherance of the business of JGx5. The proper focus of our inquiry as applied to legal expenses is on the origin of the subject of the litigation and not on the consequences to the taxpayer. Capital Video Corp. v. Commissioner, 311 F.3d at 464 (citing United States v. Gilmore, 372 U.S. 39, 48 (1963)). The origin of the claim was Investec's alleged fraudulent activity that devalued the R&E shares that petitioners held as minority shareholders. Petitioners--not JGx5--joined the shareholder litigation group against Investec. As noted, the litigation and petitioners' obligation to fund the litigation arose before JGx5 was ever created.

At all relevant times, the R&E shares were registered in petitioners' names. As Mr. Garcia testified, the purpose of the litigation was to secure judgment in favor of the R&E shareholders and recover their investments.

Petitioners contend that in the "Special Minutes" they assigned all their R&E litigation rights to JGx5 and that the prospect of an ultimate payout to JGx5 from the R&E litigation constitutes a legitimate business activity of JGx5 as to which the legal expenses should be deemed an ordinary and necessary business expense. As noted, we assign little significance to these "Special Minutes", unsupported as they are by any objective evidence. In any event, contrary to the teaching of Gilmore, petitioners' argument focuses improperly on the potential consequences of the R&E shareholders' lawsuit--a potential payout in which JGx5 would allegedly share--rather than upon the origin and character of the underlying claim. Moreover, the absence of any reliable documentation, such as a contract, defining the role of JGx5 in the litigation or guaranteeing it a share of any future recovery further supports the conclusion that petitioners engaged in the R&E litigation in their personal capacities as investors in R&E and not on behalf of JGx5.

In the light of these considerations we assign little credence to petitioners' assertions that JGx5 engaged in "litigation funding" as a business and that

petitioners lent money to JGx5 to fund the litigation. In the first instance, for an activity to constitute a trade or business, "the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). During 2012 the R&E litigation was JGx5's only claimed "litigation funding" activity. We are not convinced that during 2012 JGx5 was involved in any "litigation funding" activity with the continuity and regularity necessary for that activity to constitute a trade or business. Similarly, even if, as petitioners allege, Mr. Garcia, through JGx5, provided advisory services to the R&E litigation, the record does not show that JGx5 provided advisory services with the continuity and regularity necessary for that activity to constitute a trade or business.

Petitioners have failed to show that any of the disputed legal and professional fees were paid or incurred by JGx5 as ordinary and necessary expenses in carrying on its trade or business. Accordingly, we sustain respondent's determination that these items are not deductible by JGx5 under section 162.

## II. Accuracy-Related Penalty

Respondent determined that petitioners are liable for a 20% accuracy-related penalty pursuant to section 6662(a) and (b)(2) for an underpayment attributable to a substantial understatement of income tax.

Under section 7491(c) respondent bears the burden of production with respect to this penalty. To meet this burden, respondent must produce evidence establishing that it is appropriate to impose this penalty. Once respondent has met his burden of production, the burden of proof is upon the taxpayer to show that he is not liable for the penalty. See Higbee v. Commissioner, 116 T.C. 438, 449 (2001).[12]

Section 6662(a) and (b)(2) imposes the accuracy-related penalty on any portion of a tax underpayment that is attributable to any substantial understatement of income tax, defined in section 6662(d)(1)(A) as an understatement that exceeds the greater of 10% of the tax required to be shown on the return or $5,000. The total tax reported on petitioners' 2012 tax return was $100,661; the understatement of income tax determined in the notice of deficiency is $27,017. Therefore, the

---

[12]The parties have stipulated the existence of a signed supervisory approval form which satisfies any burden of production that respondent has under sec. 6751(b)(1) with respect to the sec. 6662(a) accuracy-related penalty. See Graev v. Commissioner, 149 T.C. __, __ (slip op. at 13-14) (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016).

amount of tax required to be shown on petitioners' 2012 tax return was $127,678.

Petitioners' understatement of tax of $27,017 exceeds $12,768, which is 10% of

the tax required to be shown on their 2012 tax return. Thus, petitioners'

understatement of income tax is substantial for purposes of the section 6662(a)

and (b)(2) accuracy-related penalty. The Court concludes that respondent has met

his burden of production for the accuracy-related penalty for a substantial

understatement of income tax for 2012.

The accuracy-related penalty does not apply with respect to any portion of

an underpayment if the taxpayer acted with reasonable cause and in good faith

with regard to that portion. Sec. 6664(c)(1). Reasonable cause requires that the

taxpayer exercised ordinary business care and prudence as to the disputed item.

United States v. Boyle, 469 U.S. 241, 246 (1985). The term "good faith" has no

precise definition but means, among other things, (1) an honest belief and (2) the

intent to perform all lawful obligations. Sampson v. Commissioner, T.C. Memo.

2013-212, at *18. The determination of whether a taxpayer acted with reasonable

cause and in good faith is made on a case-by-case basis, taking into account all

facts and circumstances. Higbee v. Commissioner, 116 T.C. at 448; sec. 1.6664-

4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of

the taxpayer's effort to assess the taxpayer's proper tax liability. Sec. 1.6664-

4(b)(1), Income Tax Regs. Other circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in the light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. Higbee v. Commissioner, 116 T.C. at 449; Sampson v. Commissioner, at *18; sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners made no attempts at trial or on brief to establish reasonable cause and good faith. Accordingly, we sustain respondent's determination that petitioners are liable for the section 6662(a) penalty for an underpayment attributable to a substantial understatement of their 2012 Federal income tax.

The Court has considered all of petitioners' arguments, contentions, and statements. To the extent not discussed herein, the Court concludes that they are moot, meritless, or irrelevant.

To reflect the foregoing,

Decision will be entered

for respondent.